**SIDLEY AUSTIN LLP**
Anthony Grossi
Shafaq Hasan
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 839-5300
Facsimile:  (212) 839-5599

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| RongXingDa Development (BVI) Limited,[1] | Case No. 22-10175 (DSJ) |
| Debtor in Foreign Proceeding. | |

## MOTION FOR (I) RECOGNITION OF FOREIGN MAIN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE, AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE

---

[1] The Debtor is incorporated in the BVI as an exempted limited liability company, and registered with registration number 1999990. The Debtor's registered office is located at Maples Corporate Services (BVI) Limited, Kingston Chambers, PO Box 173, Road Town, Tortola, BVI.

## TABLE OF CONTENTS

RELIEF REQUESTED ................................................................................................. 1

JURISDICTION AND VENUE ................................................................................... 3

BACKGROUND ......................................................................................................... 3

   I.   Debtor's Business Operations and Preexisting Capital Structure ....................... 3

     A.   The Company's Operation Segments and Business Operations ................... 4

     B.   The Debtor's Existing Capital Structure and Existing Notes ...................... 6

   II.   Events Preceding Commencement of the BVI Proceeding ............................... 7

     A.   Exchange Offer and Consent Solicitation .................................................. 8

     B.   Creditor Support Agreement ..................................................................... 9

   III.   Description of the Scheme and Issuance of New Notes ................................ 10

   IV.   Commencement of the BVI Proceeding ...................................................... 12

BASIS FOR RELIEF REQUESTED ......................................................................... 16

   I.   The Debtor Is Eligible for Chapter 15 Relief ................................................ 17

     A.   The Debtor Meets General Eligibility Requirements of Section 109(a) of the Bankruptcy Code .................................................................................... 17

     B.   The Debtor Meets Specific Eligibility Requirements of Section 1517(a) of the Bankruptcy Code .............................................................................. 20

       i.   The BVI Proceeding is a Foreign Proceeding Within the Meaning of Section 1502 of the Bankruptcy Code ....................................... 20

         (a)   *The BVI Proceeding is a Proceeding* .................................... 21

         (b)   *The Foreign Proceeding is Judicial in Character* ................. 22

         (c)   *The Foreign Proceeding is Collective in Nature* .................. 23

         (d)   *The Foreign Proceeding is Located in a Foreign Country* ................................. 24

         (e)   *The Foreign Proceeding is Authorized or Conducted Under Law Related to Insolvency or the Adjustment of Debts* ............... 24

         (f)   *Under the Foreign Proceeding, the Debtor's Assets and Affairs are Subject to the Control or Supervision of a Foreign Court* ................... 25

         (g)   *The Foreign Proceeding is for the Purpose of Reorganization or Liquidation of the Debtor* ................... 26

       ii.   The Foreign Proceedings are "Foreign Main Proceedings" .................... 26

       iii.   In the Alternative, the Court Should Find that the Foreign Proceeding is a "Foreign Nonmain Proceeding" ...................... 28

       iv.   The Chapter 15 Case Has Been Commenced by a Duly Authorized Foreign Representative ...................... 30

C.    The Petition for Recognition Meets the Requirements of Section 1515 of the Bankruptcy Code and Bankruptcy Rule 1007(a)(4) ............................................................ 31

II.    Enforcement of the Sanction Order and Scheme and Related Discretionary Relief Pursuant to Section 1521 Is Proper ......................................................................................... 33

A.    Just Treatment of All Holders of Claims Against or Interests in the Debtor's Property ............................................................................................. 35

B.    Protection of Claim Holders in the United States Against Prejudice and Inconvenience in the Processing of Claims in the Foreign Proceeding ......................... 36

C.    Distribution of Proceeds Substantially in Accordance with the Bankruptcy Code...... 36

D.    The General Balancing Test Weighs in Favor of Granting Relief ............................... 37

III.    Enforcement of the Scheme is Also Proper Under Section 1507 ...................................... 39

IV.    Enforcement of the Foreign Plans is Consistent with Principles of Comity..................... 41

V.    The Standard for Injunctive Relief is Satisfied with Respect to Enforcement of the Scheme ..................................................................................................... 44

VI.    The Relief Requested is Consistent with United States Public Policy and Policy Behind the Bankruptcy Code.......................................................... 46

NOTICE ...................................................................................................................................... 49

NO PRIOR REQUEST ............................................................................................................... 49

## TABLE OF AUTHORITIES

**Cases**

*Beveridge v. Vidunas (In re O'Reilly)*,598 B.R. 784 (Bankr. W.D. Pa. 2019) ............................ 29

*Canada S. Ry. Co. v. Gebhard*, 109 U.S. 527 (1883) ....................................................... 40, 41, 48

*Clarkson v. Coughlin*, 898 F. Supp. 1019 (S.D.N.Y. 1995) ........................................................ 44

*Cornfeld v. Investors Overseas Servs.*, Ltd., 471 F. Supp. 1255 (S.D.N.Y. 1979)...................... 48

*CT Inv. Mgmt. Co. v. Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96 (Bankr. S.D.N.Y. 2012) ....... 35

*Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452 (2d Cir. 1985) ................................... 40

*Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238 (2d Cir.
    2013) ...................................................................................................................................... 18

*Hilton* v. *Guyot*, 159 U.S. 113 (1895)......................................................................................... 43

*In re ABC Learning Centres Ltd.*, 445 B.R. 318 (Bankr. D. Del. 2010),
    *aff'd*,728 F.3d 301 (3d Cir. 2013) ......................................................................................... 23

*In re AJW Offshore, Ltd.*, 488 B.R. 551 (Bankr. E.D.N.Y. 2013) ............................................... 35

*In re Ashapura Minechem Ltd.*, No. 11-14668 (JMP) (Bankr. S.D.N.Y. 2011)........................... 20

*In re Atlas Shipping A/S*, 404 B.R. 726 (Bankr. S.D.N.Y. 2009)......................... 37, 40, 41, 47

*In re Avanti Commc'ns*, 582 B.R. 603 (Bankr. S.D.N.Y. 2018)........................................... passim

*In re B. Endeavour Shipping Co. Ltd.*, No. 15-10246 (REG) (Bankr. S.D.N.Y. 2015) ......... 21, 25

*In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*, 238 B.R. 25 (Bankr. S.D.N.Y. 1999).............. 22, 23

*In re Bd. of Dirs. of Multicanal S.A.*, 307 B.R. 384 (Bankr. S.D.N.Y. 2004) .............................. 42

*In re Bd. of Dirs. of Telecom Arg., S.A.*, 528 F.3d 162 (2d Cir. 2008) .................................. 35, 42

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund,
    Ltd.*, 374 B.R. 122 (Bankr. S.D.N.Y. 2007), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008) ..... 26, 39, 40

*In re Berau Cap. Res. Pte Ltd.*, 540 B.R. 80 (Bankr. S.D.N.Y. 2015) ................................... 18, 19

*In re Betcorp Ltd.*, 400 B.R. 266 (Bankr. D. Nev. 2009) ........................................................... 22

*In re Cell C Proprietary Ltd.*, 571 B.R. 542 (Bankr. S.D.N.Y. 2017)......................................... 41

iv

*In re Cenargo Int'l PLC*, 294 B.R. 571 (Bankr. S.D.N.Y. 2003) ................................................. 19

*In re Creative Fin., Ltd.*, 543 B.R. 498 (Bankr. S.D.N.Y. 2016) ................................................. 29

*In re Culmer*, 25 B.R. 621 (Bankr. S.D.N.Y. 1992) ....................................................... 35

*In re ENNIA Caribe Holding N.V.*, 594 B.R. 631 (Bankr. S.D.N.Y.  2018) ......................... 23, 25

*In re ENNIA Caribe Holding N.V.*, No. 596 B.R. 316 (Bankr. S.D.N.Y. 2019) ......................... 35

*In re EnQuest PLC*, No. 16-12983 (MEW) (Bankr. S.D.N.Y. 2016)..................................... 20, 25

*In re Fairfield Sentry Ltd.*, 714 F.3d 127 (2d Cir. 2013) .................................................. 26

*In re Garcia Avila*, 296 B.R. 95 (Bankr. S.D.N.Y. 2003) ............................................... 44

*In re Gerova Fin. Grp., Ltd.*, 482 B.R. 86 (Bankr. S.D.N.Y. 2012)........................................ 26

*In re Glob. Ocean Carriers*, 251 B.R. 31 (Bankr. D. Del. 2000) .................................... 19

*In re Grant Forest Prods., Inc.*, 440 B.R. 616 (Bankr. D. Del. 2010)..................................... 38

*In re Ionica PLC*, 241 B.R. 829 (Bankr. S.D.N.Y. 1999)................................................. 37

*In re Ionosphere Clubs, Inc.*, 922 F.2d 984 (2d Cir. 1990) .................................... 47, 48

*In re Magyar Telecom B.V.*, No. 13-13508 (SHL) (Bankr. S.D.N.Y. 2013) ............................... 20

*In re Metcalfe & Mansfield Alt. Inv.*, 421 B.R. 685 (Bankr. S.D.N.Y. 2010) ............ 40, 43, 46, 47

*In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 458 B.R. 63
    (Bankr. S.D.N.Y. 2011), *aff'd,* 474 B.R. 88 (S.D.N.Y. 2012)................................................ 28

*In re MMG LLC*, 256 B.R. 544 (Bankr. S.D.N.Y. 2000)..................................................... 44

*In re Ocean Rig UDW Inc.*, 570 B.R. 687 (Bankr. S.D.N.Y. 2017)...................................... passim

*In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361 (Bankr. S.D.N.Y. 2014)................................. 18, 19

*In re OIC Run-Off Ltd. & London & Overseas Ins. Co. Ltd.*,
    No. 15-13054 (SCC) (Bankr. S.D.N.Y. 2016)................................................... 21, 25

*In re Olinda Star Ltd.*, 614 B.R. 28 (Bankr. S.D.N.Y. 2020) ................................................. passim

*In re Petition of Hourani*, 180 B.R. 58 (Bankr. S.D.N.Y. 1995) ..................................... 36

*In re Qimonda AG Bankr. Litig.*, 433 B.R. 547 (E.D. Va. 2010).................................... 35

*In re Rede Energia S.A.*, 515 B.R. 69 (Bankr. S.D.N.Y. 2014)................................................. 41, 45

*In re Rubin*, 160 B.R. 269 (Bankr. S.D.N.Y. 1993) ....................................................... 45

*In re Serviços de Petróleo Constellation S.A.*, 600 B.R. 237 (Bankr. S.D.N.Y. 2019) .... 27, 29, 30

*In re Sino-Forest Corp.*, 501 B.R. 655 (Bankr. S.D.N.Y. 2013) ....................................... 43, 46, 47

*In re SphinX, Ltd.*, 351 B.R. 103 (Bankr. S.D.N.Y. 2006) ...................................... 27, 28

*In re Suntech Power Holdings Co.*, 520 B.R. 399 (Bankr. S.D.N.Y. 2014) .......................... 18, 26

*In re Towergate Fin. Plc*, No. 15-10509 (SMB) (Bankr. S.D.N.Y. 2015) ............................ 21, 25

*In re Treco*, 240 F.3d 148 (2d Cir. 2001) ................................................................ 35, 36

*In re U.S. Steel Canada Inc.*, 571 B.R. 600 (Bankr. S.D.N.Y. 2017) .................................... 18, 41

*In re Vitro S.A.B. de CV*, 701 F.3d 1036 (5th Cir. 2012) ............................................... 47

*In re YH Ltd.*, No. 16-12262 (SCC) (Bankr. S.D.N.Y. 2016) ................................................. 21, 25

*In re Yukos Oil Co.*, 321 B.R. 396 (Bankr. S.D. Tex. 2005) ............................................ 19

*JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418 (2d Cir. 2005) ................................................................ 47

*Krys v. Official Comm. of Unsecured Creditors of RefcoInc. (In re SphinX Ltd.)*, 371 B.R. 10 (S.D.N.Y. 2007) ....................................................................................... 31

*Victrix S.S. Co. v. Salen Dry Cargo A.B.*, 825 F.2d 709 (2d Cir. 1987) ..................... 40, 41, 44, 47

**Statutes**

11 U.S.C. § 101(23) ......................................................................................... 21

11 U.S.C. § 101(24) .................................................................................... 1, 30, 31

11 U.S.C. § 103(a) ........................................................................................ 17

11 U.S.C. § 105(a) ......................................................................................... 1

11 U.S.C. § 109(a) ................................................................................. 17, 18, 19, 33

11 U.S.C. § 1501 ................................................................................... 16, 38, 46

11 U.S.C. § 1501(a) ....................................................................................... 48

11 U.S.C. § 1502(2) .................................................................................... 28, 29

11 U.S.C. § 1502(4) ...................................................................................... 1, 26

11 U.S.C. § 1502(5) ........................................................................................................ 1

11 U.S.C. § 1504 ................................................................................................. 1, 3, 31, 33

11 U.S.C. § 1506 ......................................................................................................... 47

11 U.S.C. § 1507 ................................................................................................. 1, 39, 41, 44

11 U.S.C. § 1507(a) ...................................................................................................... 2, 39

11 U.S.C. § 1507(b) ......................................................................................................... 39

11 U.S.C. § 1509(a) ......................................................................................................... 33

11 U.S.C. § 1510 ........................................................................................................... 1

11 U.S.C. § 1515 ..................................................................................................... passim

11 U.S.C. § 1515(a) ......................................................................................................... 32

11 U.S.C. § 1515(b) ......................................................................................................... 32

11 U.S.C. § 1516(a) ......................................................................................................... 30

11 U.S.C. § 1516(b) ......................................................................................................... 33

11 U.S.C. § 1516(c) ......................................................................................................... 26

11 U.S.C. § 1517 ....................................................................................................... 1, 17

11 U.S.C. § 1517(a) ................................................................................................... passim

11 U.S.C. § 1517(b)(2) ..................................................................................................... 28

11 U.S.C. § 1519 ......................................................................................................... 32

11 U.S.C. § 1520 ......................................................................................................... 1, 33

11 U.S.C. § 1521 ................................................................................................. 1, 41, 44

11 U.S.C. § 1521(a) ................................................................................................. 2, 33, 34

11 U.S.C. § 1521(a)(7) ...................................................................................................... 33

11 U.S.C. § 1521(e) ......................................................................................................... 44

11 U.S.C. § 1522 ........................................................................................................... 1

11 U.S.C. § 1522(a) ......................................................................................................... 34

11 U.S.C. §1502 ................................................................................................. 20

28 U.S.C. § 1334 ................................................................................................. 3

28 U.S.C. § 1410 ................................................................................................. 3

28 U.S.C. § 157 ................................................................................................... 3

28 U.S.C. § 157(b)(2)(P) ..................................................................................... 3

BVI Business Companies Act, 2004 § 179(A) ............................................... 1, 8

**Rules**

Fed. R. Bankr. P. 1007(a)(4) ......................................................................... 17, 33

Fed. R. Bankr. P. 2002(q) ................................................................................... 49

Fed. R. Bankr. P. 7007.1 ..................................................................................... 32

**Other Authorities**

8 Collier on Bankruptcy, ¶ 1501.03 (16th ed. 2021) ......................................... 25

*Amended Standing Order of Reference* dated January 31, 2012, Reference M-431,
   *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012)
   (Preska, C.J.) .................................................................................................... 3

David L. Lawton and Shannon B. Wolf, *The Thing about Schemes in the Scheme of Things:
   Recognition of Schemes of Arrangement under Chapter 15 of the U.S. Bankruptcy Code*
   (INSOL International Technical Series Issue No. 38, March 2018) ...................... 21

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Mr. Liu Jingrui, in his capacity as the authorized foreign representative (the "Foreign Representative" or "Petitioner") for the above-captioned debtor (the "Debtor" and, together with its non-Debtor affiliates, the "Company") that is subject to a restructuring proceeding entitled *In the Matter of Rongxingda Development (BVI) Limited* (the "BVI Proceeding"), concerning a scheme of arrangement between the Debtor and Scheme Creditors (as defined herein), pursuant to section 179A of the BVI Business Companies Act, 2004 (the "BVI Companies Act"), currently pending before the High Court of the Eastern Caribbean Supreme Court (the "BVI Court") of the British Virgin Islands (the "BVI") Case Number: BVIHC (COM) 0008 of 2022, by and through his undersigned counsel, respectfully submits this motion (this "Motion") and represents as follows:

### RELIEF REQUESTED

1.      Pursuant to this Motion, the Foreign Representative respectfully requests, pursuant to sections 105(a), 1504, 1507, 1510, 1515, 1517, 1520, 1521 and 1522 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), entry of an order substantially in the form annexed hereto as **Exhibit A** (the "Proposed Recognition Order") (i) granting recognition of the BVI Proceeding pursuant to section 1517 of the Bankruptcy Code as a "foreign main proceeding" (as defined in section 1502(4) of the Bankruptcy Code) of the Debtor, and all relief included therewith as provided in section 1520 of the Bankruptcy Code, or, in the alternative, granting recognition of the BVI Proceeding pursuant to section 1517 of the Bankruptcy Code as a "foreign nonmain proceeding" (as defined in section 1502(5) of the Bankruptcy Code), and all relief included therewith; (ii) recognizing the Petitioner as the "foreign representative" (as defined in section 101(24) of the Bankruptcy Code) of the BVI Proceeding; (iii) granting full force and effect and comity to the Scheme and the BVI Orders (as defined herein) and the additional relief

1

set forth herein pursuant to section 1521(a) and/or 1507(a) of the Bankruptcy Code; (iv) enjoining parties from taking any action inconsistent with the Scheme in the United States; (v) authorizing the Notes Trustee, and any successor trustee (including the New Notes Trustee) to take any and all actions necessary to give effect to the terms of the proposed restructuring of the Debtor (the "Restructuring") and (vi) granting such other and further relief as the United States Bankruptcy Court for the Southern District of New York (the "Court") deems just and proper. The relief requested in this Motion is without prejudice to any additional relief the Foreign Representative may request.

2.     In support of this Motion, the Foreign Representative submits the *Declaration of Liu Jingrui in Support of the Motion for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Jingrui Declaration"); the *Declaration of Alexander Teck Chai Ridgers in Support of the Motion for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Ridgers Declaration" and together with the Jingrui Declaration, the "Declarations"); and, the *Statements of Foreign Representative Required by Section 1515(c) of the Bankruptcy Code, Rule 1007(a)(4) of the Fed. R. of Bankr. P. and Rule 1007-3 of the Local Bankruptcy Rules* (collectively, the "Supporting Documents"), which have been filed contemporaneously herewith and are incorporated herein by reference.[2]

---

[2] Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Declarations and Supporting Documents, as applicable.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334

and the *Amended Standing Order of Reference* dated January 31, 2012, Reference M-431,

*In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012)

(Preska, C.J.).   Recognition of a foreign proceeding and other matters under chapter 15 of the

Bankruptcy Code have been designated core matters under 28 U.S.C. § 157(b)(2)(P).

4.      The Foreign Representative has properly commenced this chapter 15 case

(this  "Chapter 15 Case") pursuant to sections 1504 and 1509 of the Bankruptcy Code by filing a

petition for recognition of the BVI Proceeding under section 1515 of the Bankruptcy Code

(the "Chapter 15 Petition").

5.      Venue is proper under 28 U.S.C. § 1410 as the Debtor has assets within the United

States located in New York, as described further herein.

## BACKGROUND

**I.      Debtor's Business Operations and Preexisting Capital Structure**

6.      The Debtor was incorporated in the BVI under the BVI Companies Act as an

exempted company with limited liability on November 30, 2018.

7.      The Debtor is a non-operating special purpose vehicle that is wholly owned by

RiseSun Land Development (Hong Kong) Limited, which is in turn owned by the ultimate parent

and holding company RiseSun Real Estate Development Co., Ltd. ("RiseSun").   The Debtor was

incorporated for the purpose of issuing the Existing Notes (as defined herein).

8.      The Company is a leading real estate developer in the People's Republic of China

(the "PRC"), focusing on developing quality residential properties.   Founded in Hebei province in

1996, the Company has established a strong market position in the Beijing-Tianjin-Hebei Bohai

Economic Rim and the Yangtze River Delta Region, and has been actively expanding into the

Greater Bay Area and central and western China.  The Company's shares have been listed on the Shenzhen Stock Exchange since 2007.

### A.    The Company's Operation Segments and Business Operations

9.    The Company's business operations are separated into four segments: property development; hotel and resort development and operation; property management; and, other miscellaneous sectors.  The Company primarily develops small-to-mid-sized residential properties targeting first-time homebuyers and upgraders.  In addition to the property development business, with a view to diversifying its business portfolio and creating multiple streams of income, the Company also has expanded into other businesses, including, among others, new industry town development and operations, hotel and resort operations, architectural design, health care, and internet and finance businesses.  The Company's revenue for the year ended December 31, 2020 amounted to RMB$71.51 billion or US$11.23 billion.  The Company's revenue for the nine months ended September 30, 2021 amounted to RMB$45.91 billion or US$7.21 billion.[3]

10.    With respect to the Company's property development segment, the Company develops a variety of quality and residential properties, primarily dwelling-size apartments and mid-and-high-end apartments, that meet the differentiated demands of first-time homebuyers and upgraders.  The Company also develops commercial properties, such as shopping malls and office buildings, integrated with, or in the vicinity of, the residential properties or economic centers.  As of June 30, 2021, the Company had a total of 370 property development projects at various stages of development, covering more than eighty-six (86) cities across China.  For the six months ended June 30, 2021, revenue from the property development business amounted to RMB$31.58 billion or US$4.96 billion.

---

[3] For the purposes of conversion, the Motion uses the prevailing currency conversion rates on February 9, 2022.

11.     Further, the Company engages in hotel and resort development and management to complement its property development business.  The Company operates and manages hotels and resorts under five brands, namely Arcadia (阿尔卡迪亚), Rongxi Manor (荣玺庄园), Zuolin Youli (佐邻佑里), Rongxin (荣馨) and Rongyi (荣逸).  As of June 30, 2021, the Company had fifty (50) hotels and resorts under its management with over 14,000 rooms.  For the six months ended June 30, 2021, revenue from the hotel and resort operation business amounted to RMB$342.10 million or US$53.76 million.

12.     The Company also provides property management services to tenants to expedite their operation and production in the new industry towns.  Property management services include gardening and greening, cleaning, security, and repair and maintenance services.  For the six months ended June 30, 2021, revenue from the property management business amounted to RMB$740.50 million or US$116.37 million.

13.     Lastly, the Company operates certain businesses that include architectural design and finance.  The Company has established RiseSun Architectural Design Co., Ltd. (荣盛建筑设计有限责任公司) to provide architectural design, landscape design and interior design services. The Company started its finance business early in 2010 and established a subsidiary RiseSun Taifa (Beijing) Investment Fund Management Company Limited (荣盛泰发（北京）投资基金管理有限公司).  As of June 30, 2021, RiseSun Taifa had established over 100 real estate funds together with banks, trust firms, and state-owned financial institutions, with asset under management of approximately RMB$30.00 billion or US$4.71 billion.  For the six months ended June 30, 2021, revenue from other business amounted to RMB$1.56 billion or US$245.17 million.

**B.      The Debtor's Existing Capital Structure and Existing Notes**

14.      As noted, the Debtor is a special purpose entity that was incorporated for the

purposes of issuing the following notes:

a)      An aggregate principal amount of US$500.00 million 8.0% senior notes with a
maturity date of April 24, 2022 (the "April 2022 Notes") issued pursuant to an
indenture dated April 24, 2019 (the "April 2022 Notes Indenture") between the
Debtor as issuer, RiseSun as parent guarantor, and China Construction Bank (Asia)
Corporation Limited as the notes trustee (the "Notes Trustee"); and

b)      An aggregate principal amount of US$300.00 million 8.95% senior notes with a
maturity date of January 18, 2022 (the "January 2022 Notes" and together with the
April 2022 Notes, the "Existing Notes") issued pursuant to an indenture dated
January 19, 2021 (the "January 2022 Notes Indenture" and together with the April
2022 Notes Indenture and the parent guarantee, the "Existing Notes Documents")
entered into between the Debtor as issuer, RiseSun as parent guarantor, and the
Notes Trustee.

15.      The proceeds from the Existing Notes were transferred to RiseSun by way of an

intercompany loan (the "Intercompany Loan").  The Debtor has no other significant assets other

than the Intercompany Loan and no other significant liabilities apart from its obligations under the

Existing Notes.

16.      The Company announced on January 10, 2022 that, from January 14, 2022, the

coupon rate on the Existing Notes would increase to 9.5% per annum in respect of the outstanding

principal of Existing Notes, equal to the interest rate of the New Notes (as defined herein),

and interest accrued at such rate will be paid on the Transaction Effective Date (as defined herein).

17.      As of January 17, 2022, the total amount outstanding under the April 2022 Notes

is US$487.70 million and the total amount outstanding under the January 2022 Notes is

US$292.00 million, cumulatively totaling US$779.70 million outstanding under the Existing

Notes (the "Total Outstanding Principal Amount").

18.      As further detailed below, on January 18, 2022, in light of the support level for the

Creditor Support Agreement and the Debtor's decision to proceed with the Scheme, the Company

did not make payment of all amounts due and payable under the January 2022 Notes upon the final maturity date.

19.     Given that the Debtor is a non-operating entity, the payment under the Existing Notes was intended to be paid by RiseSun through operating income, net profit, cash flow from operating activities and other financing sources of the Company.  A decline in property sales and difficulty in obtaining funding from onshore and offshore capital markets, however, precipitated the need for alternative restructuring options.

## II.     Events Preceding Commencement of the BVI Proceeding

20.     During the second half of 2021, Chinese property developers and the capital markets that funded the growth and development of the sector have experienced an inflection point. Reduced bank lending for real estate development has resulted in reduced access by property developers to PRC capital.   In addition, reduced bank lending for buyers seeking mortgage financing, as well as buyers' concerns about the ability of property developers to complete projects, has resulted in reduced property sales.   Adverse reaction to these PRC events by international capital markets has limited the Company's funding sources to address upcoming maturities.

21.     Prior to the commencement of this Chapter 15 Case and the BVI Proceeding, certain commercial bills and wealth management products in the PRC issued or guaranteed by RiseSun and/or its subsidiaries became due and payable.  RiseSun has been actively negotiating with the relevant creditors in order to resolve any issues regarding the payment maturities within a reasonable timeframe.

22.     As the Debtor disclosed in an announcement dated December 10, 2021, the Debtor appointed Haitong International Securities Company Limited and its affiliates, a securities firm in the Hong Kong Special Administrative Region of the People's Republic of China, as its financial

adviser and Sidley Austin as its legal adviser to review its potential options and to assist the Debtor in its debt restructuring negotiations with the holders of the Existing Notes, in light of the adverse impact of a number of factors, including the COVID-19 pandemic. RiseSun and the Debtor also encouraged holders of the Existing Notes to come forward and establish contact so the Debtor could initiate consensual restructuring discussions.

### A. Exchange Offer and Consent Solicitation

23.     Since the appointment of its advisers, the Debtor has been involved in extensive discussions with its financial and legal advisers in relation to the restructuring of the Debtor's liabilities under the Existing Notes.

24.     In light of the Existing Notes maturities and concentration of maturities of the Company's other indebtedness, on December 16, 2021, the Debtor launched an exchange offer and consent solicitation as part of an overall strategy to improve its financial condition, extend its debt maturity profile, strengthen its balance sheet, and improve its cash flow management (the "Exchange Offer and Consent Solicitation"). The Debtor offered certain eligible holders of the Existing Notes the opportunity to, among other things, exchange their Existing Notes for new notes with new terms (a new tenor amongst the new terms) designed to allow the Company as a whole to improve its financial condition and provide the necessary financial stability to continue as a going concern.

25.     Separately, the Debtor also understood that, as an alternative to the Exchange Offer and Consent Solicitation, a restructuring of the Existing Notes could be implemented via a scheme of arrangement under section 179A of the BVI Companies Act. Accordingly, at the same time as launching the Exchange Offer on December 16, 2021, the Debtor entered into the Creditor Support Agreement (as defined herein), setting out the terms of the restructuring.

26.     By the conclusion of the Exchange Offer and Consent Solicitation, over seventy-five percent (75%) of all Existing Notes were tendered for the Exchange Offer and Consent Solicitation.   The Debtor, however, did not obtain sufficient support from the holders of the Existing Notes to effect the Exchange Offer and Consent Solicitation.   In order to ensure that the Debtor's liabilities under the Existing Notes are comprehensively restructured, on January 10, 2022, the Debtor announced that the Exchange Offer and Consent Solicitation had terminated and that it would seek to effect the restructuring via a scheme of arrangement in the BVI, in accordance with the terms of the Creditor Support Agreement.

### B.     Creditor Support Agreement[4]

27.     The Debtor also required, as a condition to participate in the Exchange Offer and Consent Solicitation, each holder of the Existing Notes to execute the creditor support agreement (or an accession thereto) in support of a potential scheme to restructure the debt under the Existing Notes (the "Creditor Support Agreement" or "CSA").

28.     Under the terms of the CSA, the Debtor and RiseSun have undertaken to pay the Instruction Fee (an amount in cash equal to 1.5% of the aggregate principal amount of the eligible note as of the Instruction Fee Deadline) on the day when all conditions precedent to the Existing Notes restructuring have been satisfied or waived (the "Transaction Effective Date") (or as soon as practicable thereafter) in respect of each of the Existing Notes (providing that, among other conditions, the relevant Consenting Creditor has not committed a material breach of any terms of the CSA and votes in favor of the Scheme at the Scheme Meeting) (as both terms are defined herein).

---

[4] Capitalized terms used in this section, but not defined are given their meaning under the Creditor Support Agreement.

29.     By January 7, 2022, the Debtor received Accession Deeds consenting to the CSA from certain Scheme Creditors (as defined herein) holding over seventy-five percent (75%) or US$590.18 million in aggregate principal amount of the Existing Notes.  On January 10, 2022, the Debtor announced the termination of the Exchange Offer and Consent Solicitation and its intention to implement the restructuring via the Scheme and pursuant to the Creditor Support Agreement to seek a more holistic resolution with respect to the exchange of all the Existing Notes into the New Notes.  On January 10, 2022, the Debtor also announced that the Instruction Fee for all Eligible Holders who had validly tendered their Existing Notes for exchange in accordance with the terms of the Exchange Offer and Consent Solicitation and acceded to the Creditor Support Agreement would be increased from 0.5% to 1.5% of the aggregate principal amount of an Existing Note as set out in the Creditor Support Agreement.

**III.    Description of the Scheme and Issuance of New Notes**

30.     As described in further detail in the Ridgers Declaration, a scheme of arrangement is a compromise or arrangement entered into between a company and its creditors, as provided for under section 179A of the BVI Companies Act.  A scheme of arrangement enables a company to enter into a compromise or arrangement in respect of its debts or obligations with its creditors, or one or more classes of its creditors.  A scheme of arrangement is approved by the requisite majorities of creditors if a majority of creditors representing at least seventy-five percent (75%) in value of the relevant creditors of the Debtor present and voting at the scheme meeting vote in favor of such scheme.

31.     Under a scheme of arrangement with its creditors, the Debtor seeks to restructure the Debtor and the Company's liabilities under the Existing Notes.  Pursuant to the CSA and the Exchange Offer and Consent Solicitation, creditors of the Debtor who have claims under the Existing Notes against the Debtor and RiseSun, as the obligors under the Existing Notes

10

(the "Scheme Creditors") will irrevocably, unconditionally, fully and absolutely release the Debtor

and RiseSun, among others, from their respective obligations and liabilities under or in connection

with the Existing Notes Documents (the "Scheme Restructuring"). In so doing, the Scheme

Creditors will receive the following consideration (the "Scheme Consideration"):

a) a cash redemption equal to 5% of the outstanding principal amount of the Existing Notes held by each Scheme Creditor as of the Record Time;

b) New Notes in an aggregate principal amount equal to ninety-five percent (95%) of the outstanding principal amount of the Existing Notes held by each Scheme Creditor as of the Record Time and, without double counting, any Residual New Notes; and

c) accrued and unpaid interest on the Existing Notes up to but excluding the Transaction Effective Date (at a rate of (i) 8.95% per annum in respect of the January 2022 Notes and 8.0% per annum in respect of the April 2022 Notes up to and including January 13, 2022 and (ii) 9.5% per annum in respect of the Existing Notes from January 14, 2022), in cash.

32. Additional information about the Scheme is set forth in the explanatory statement

for the Scheme (the "Explanatory Statement").[5]

33. Therefore, pursuant to the Scheme, the Debtor is restructuring its and RiseSun's

existing indebtedness under the Existing Notes Documents. The Debtor will also be issuing new

notes on the Transaction Effective Date, consisting of ninety-five percent (95%) of the Total

Outstanding Principal Amount, including:

a) Notes bearing interest at 9.5% with a tenor of 364 days (the "New 2023 Notes") guaranteed by RiseSun, with China Construction Bank (Asia) Corporation Limited serving as the notes trustee (the "New Notes Trustee"); and

b) Notes bearing interest at 9.5% with a tenor of 2.5 years (the "New 2024 Notes" and together with the New 2023 Notes, the "New Notes"), guaranteed by RiseSun, with the New Notes Trustee.

---

[5] A copy of the Explanatory Statement, as made available to Scheme Creditors on February 9, 2022 (following the Convening Hearing (as defined below)), is attached as **Exhibit E** to the Ridgers Declaration.

34.    On the Transaction Effective Date, all outstanding Existing Notes will be cancelled and all guarantees in connection with the Existing Notes will be released, including RiseSun's guarantee of the Debtor's obligations under the Existing Notes.

35.    Further, in exchange for the compromises set forth in the Scheme and the Scheme Consideration, the Scheme provides for certain releases, including the release by Scheme Creditors of any released claim against the Debtor, RiseSun, the Company and their affiliates and their personnel (the "Released Person").  The claims released through the Scheme include any claim in connection with the Scheme Restructuring, an Ancillary Claim[6] or any past, present and/or future claim arising out of, relating to or in respect of: (a) the Existing Notes Documents; (b) the preparation, negotiation, sanction or implementation of the Scheme and/or the CSA; and/or (c) the execution of the various restructuring documents and the carrying out of the steps and transactions contemplated in the Scheme in accordance with their terms (for the avoidance of doubt, excluding any claims relating to the New Notes documents).

36.    If the Scheme is approved by the requisite majorities of creditors and sanctioned by the BVI Court and a sealed copy of the Sanction Order is filed with the BVI Registrar, the Scheme will bind all Scheme Creditors, including those creditors who voted in favor of the Scheme, those creditors who voted against it, and those creditors who did not vote at all.

**IV.    Commencement of the BVI Proceeding**

37.    On January 17, 2022, the Debtor's sole director (the "Sole Director") approved a resolution, a copy of which is attached to the Jingrui Declaration as **Exhibit A** (the "Sole Director Resolution"), permitting the Debtor to propose the Scheme to initiate the

---

[6] Pursuant to the Scheme, an Ancillary Claim means a claim against a Released Person (other than the Debtor) arising directly or indirectly out of, in relation to and/or in connection with the Existing Notes Documents, whether before, at, or after the Record Time.

restructuring of the Existing Notes and appointing the Petitioner as the Foreign Representative and commencing the Chapter 15 Case.  On the same day, the Debtor filed a Fixed Date Claim Form with the BVI Court, a true and correct copy of which is attached to the Ridgers Declaration as **Exhibit B** (the "Fixed Date Claim Form"), commencing the BVI Proceeding, and seeking, among other things, an order directing the Company to convene a meeting in respect of the Scheme (the "Scheme Meeting") for a single class of creditors only—namely, the Scheme Creditors— requesting a convening hearing (the "Convening Hearing") on February 8, 2022, and seeking the appointment of the Foreign Representative.

38.     On January 18, 2022, the Debtor issued a practice statement letter to the Scheme Creditors, informing the Scheme Creditors that the Debtor wished to commence the Scheme ahead of a Convening Hearing.  The Practice Statement Letter is attached to the Ridgers Declaration as **Exhibit C**.

39.     Following the Convening Hearing on February 8, 2022, the BVI Court entered the order scheduling the Scheme Meeting for March 3, 2022 at 7:00 a.m. (prevailing Atlantic Standard Time), scheduling the hearing to sanction the Scheme for March 10, 2022 (the "Sanction Hearing"), and appointing the Foreign Representative (the "Convening Order"). The Convening Order is attached to the Jingrui Declaration as **Exhibit B**.

40.     By February 9, 2022, and in accordance with the Convening Order, a notice of the Scheme Meeting substantially in the form set forth in Appendix 10 to the Explanatory Statement was sent to the Scheme Creditors by Morrow Sodali Limited, in its capacity as the Debtor's notification and information agent for the Scheme ("Morrow Sodali" or "MS").   Jingrui Declaration, ¶ 41. The notice, the Scheme, the Solicitation Package, and the Explanatory Statement were also made available to the Scheme Creditors and other parties in interest on the

following       website       maintained       by       MS       (the       "MS       Case       Website"):
https://bonds.morrowsodali.com/RisesunScheme. *Id.* A copy of the Debtor's Explanatory
Statement is attached to the Ridgers Declaration as **Exhibit E**.  In addition, the Debtor also
published notice in various local newspapers to reach Scheme Creditors, including the *Business
Times* in Singapore, the *London Gazette* in the United Kingdom, the *Neue Zurcher Zeitung* in
Switzerland and the *BVI Beacon* in the BVI.  Further, in Hong Kong, the Debtor published notice
in English in the *South China Morning Post* and notice in Chinese in the *Singtao Daily*.  Pursuant to
the Convening Order, the Debtor is also required to make physical copies of the Scheme and
Explanatory Statement available to all Scheme Creditors for collection free of charge prior to the
Scheme Meeting.  Jingrui Declaration, ¶ 41.

41.     In this instance, the BVI Court authorized and appointed Mr. Andrew Thorp of
Harney Westwood & Riegels LP ("Harneys") and/ or Mr. Alexander Teck Chai Ridgers of
Harneys as the Scheme Chairperson.  *Id.*, ¶ 42.

42.     The provisions of the Convening Order ensure that the Scheme Creditors will be
notified properly of the Scheme Meeting and will have the opportunity to raise questions and
objections to the Scheme at the Scheme Meeting and/or at the Sanction Hearing.  As noted,
pursuant to the terms of the Convening Order, in advance of the Scheme Meeting and Sanction
Hearing, the Debtor, through its notification and information agent MS, will provide access to the
Explanatory Statement and other documents related to the Scheme enumerated in the Convening
Order to the beneficial holders of the Existing Notes on the MS Case Website and physical copies
as well.  *Id.*, ¶¶ 41–43.  All Scheme Creditors will have the opportunity to attend, be heard and
vote at the Scheme Meeting, in person, by authorized representative (if a corporate entity) or by
proxy and to ask questions regarding the proposed Scheme.

14

43.     At the Scheme Meeting, a vote will be held to determine whether the Scheme Creditors that are present and voting in person or by proxy approve the Scheme by a greater than fifty percent (50%) majority in number representing at least seventy-five percent (75%) in value of the Scheme Creditors present and voting.  If the Scheme Creditors do not approve the Scheme by the requisite majorities described in the foregoing sentence, the Scheme is not eligible to be sanctioned by the BVI Court and will not take effect.

44.     If the Scheme is approved at the Scheme Meeting, the Sanction Hearing is expected to be held on or about March 10, 2022, as set forth in the Convening Order.  *Id.*, ¶ 45.  The Scheme Creditors and any other creditors of the Debtor may choose to attend the Sanction Hearing and be heard and/ or to raise objections.

45.     Assuming that the BVI Court deems it appropriate to enter an order sanctioning the Scheme following the Sanction Hearing (the "Sanction Order" and together with the Convening Order, the "BVI Orders"), the Sanction Order is expected, among other things, to (i) sanction and approve consummation of the Scheme and (ii) authorize and effectuate the Scheme Restructuring set forth in the Scheme.  Upon delivery of the Sanction Order to the BVI Registrar of Companies and satisfaction of the other conditions precedent, the Scheme will become effective and thereby binding on all Scheme Creditors.  Accordingly, the expected timeline for the BVI Proceeding and this Chapter 15 Case is summarized below.

15

| Key Events | Date |
|---|---|
| BVI Convening Hearing | February 8, 2022 |
| BVI Convening Order and Appointment of Foreign Representative | February 8, 2022 |
| Chapter 15 Petition Date | February 14, 2022 |
| BVI Scheme Meeting | March 3, 2022 |
| BVI Sanction Hearing | March 10, 2022 |
| Anticipated Entry of the BVI Sanction Order | March 10, 2022 to March 14, 2022 |
| Proposed Chapter 15 Recognition Hearing | March 15, 2022 |
| BVI Anticipated Transaction Effective Date | March 15, 2022 to March 17, 2022 |

## **BASIS FOR RELIEF REQUESTED**

46.     The Foreign Representative and the Debtor seek to fully implement the terms of the Scheme to effectuate the Restructuring.  Towards that end, the Scheme and the BVI Orders must be binding and enforceable in the United States, and the Scheme Creditors must be precluded from taking any actions in the United States that may frustrate the Restructuring effectuated by the BVI Proceeding.  Chapter 15 of the Bankruptcy Code is designed to, *inter alia*, protect and maximize the value of a foreign debtor's assets and to facilitate the rehabilitation of financially distressed businesses.  *See* 11 U.S.C. § 1501.

47.     Consistent with these principles, the Foreign Representative commenced this Chapter 15 Case to obtain recognition of the BVI Proceeding and to give full recognition and enforcement to the BVI Orders and the Scheme.  The Foreign Representative believes that this Chapter 15 Case will enable the Debtor to achieve the objectives of the Scheme by (i) ensuring that the parties in interest to the Restructuring, including the Debtor, Scheme Creditors, the Notes

Trustee, and the New Notes Trustee, are treated in the United States consistent with the intentions of the Scheme; (ii) ensuring that the Scheme Restructuring is binding, valid and enforceable in the United States; and (iii) minimizing the risk of litigation over any potential residual claims that might exist under the Existing Notes or ancillary documents related to the Existing Notes.

48.      Section 1517 of the Bankruptcy Code provides clear and objective standards that must be satisfied for recognition.  Unless doing so would be manifestly contrary to United States public policy, an order recognizing a foreign proceeding must be entered if: (a) the proceeding for which recognition is sought is a foreign proceeding; (b) the foreign proceeding is a foreign main proceeding or foreign nonmain proceeding; (c) recognition is sought by a foreign representative; and (d) the Chapter 15 Petition meets the procedural requirements of section 1515 of the Bankruptcy Code. For the reasons set forth below and in the Supporting Documents, the relief sought herein is appropriate under chapter 15 of the Bankruptcy Code.

## I.      The Debtor Is Eligible for Chapter 15 Relief

49.      To be eligible for chapter 15 relief, the Debtor must meet the general eligibility requirements under section 109(a) of the Bankruptcy Code as well as the more specific eligibility requirements under section 1517(a) of the Bankruptcy Code.   In addition, the petition for recognition must meet the requirements of section 1515 of the Bankruptcy Code and rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). As demonstrated below, the Debtor meets all such eligibility requirements.

### A.      The Debtor Meets General Eligibility Requirements of Section 109(a) of the Bankruptcy Code

50.      Section 103(a) of the Bankruptcy Code provides that chapter 1, which includes section 109(a), "appl[ies] in a case under chapter 15." 11 U.S.C. § 103(a).  Thus, the Debtor must meet the eligibility requirements of section 109(a) of the Bankruptcy Code to obtain relief under

17

chapter 15.  Section 109(a) of the Bankruptcy Code provides that "[n]otwithstanding any other provision of this section, only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor under this title." 11 U.S.C. § 109(a).  Thus, under section 109(a), a foreign debtor must reside or have a domicile, a place of business or property in the United States to be eligible to file a chapter 15 petition.  *See Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238 (2d Cir. 2013).

51.     Section 109(a) of the Bankruptcy Code does not require a specific quantum of property in the United States, nor does it indicate when or for how long such property must have a U.S. situs.  *See, e.g., In re Berau Cap. Res. Pte Ltd.*, 540 B.R. 80, 82 (Bankr. S.D.N.Y. 2015).  Courts in this Circuit have accordingly held that bank accounts or attorney retainers deposited in New York satisfy the "property in the United States" eligibility requirement of section 109(a) of the Bankruptcy Code.  *See In re Ocean Rig UDW Inc.*, 570 B.R. 687, 700 (Bankr. S.D.N.Y. 2017) (citing a retainer held by New York counsel in a New York account as satisfying section 109(a) of the Bankruptcy Code and establishing venue); *In re U.S. Steel Canada Inc.*, 571 B.R. 600, 610 (Bankr. S.D.N.Y. 2017) ("[C]ourts, including this one, have held that an undrawn retainer in a United States bank account qualifies as property in satisfaction of section 109(a)"); *In re Suntech Power Holdings Co.*, 520 B.R. 399, 416 (Bankr. S.D.N.Y. 2014) (holding that establishing a deposit account in New York "had the effect of establishing a basis for venue in [the Southern District of New York] under 28 U.S.C. § 1410(1)"); *In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361, 373–74 (Bankr. S.D.N.Y. 2014) (finding that the debtor "had property in the United States in the form of a retainer[, which] is sufficient to satisfy the requirements of section 109(a)

of the Bankruptcy Code," and that "the Foreign Representatives acted in good faith in transferring the funds to the Client Trust Account" to serve as a retainer).

52.    Additionally, this Court has previously held that a debtor's contract rights, including rights pursuant to debt that contains a New York governing law and forum selection clause, constitute intangible property of the debtor in New York for purposes of section 109(a) of the Bankruptcy Code.  *See, e.g.*, *In re Olinda Star Ltd.*, 614 B.R. 28, 40 (Bankr. S.D.N.Y. 2020) (holding that a foreign debtor was a "debtor" under section 109(a) of the Bankruptcy Code because of intangible contract rights under a New York law governed indenture); *In re Avanti Commc'ns*, 582 B.R. 603, 610–11 (Bankr. S.D.N.Y. 2018) (same); *Berau*, 540 B.R. at 83–84 (same).

53.    Here, the Debtor satisfies the eligibility requirement of section 109(a) because the Debtor has property in the United States, including in this jurisdiction.  Specifically, the Debtor has property in the United States in the form of a retainer with the Debtor's U.S. counsel, Sidley Austin, which funds are held in a client trust account in New York, New York. Jingrui Declaration, ¶ 51.  *See, e.g.*, *Octaviar*, 511 B.R. at 372–73 (Bankr. S.D.N.Y. 2014) ("There is a line of authority that supports the fact that prepetition deposits or retainers can supply 'property' sufficient to make a foreign debtor eligible to file in the United States.") (citing *In re Cenargo Int'l PLC*, 294 B.R. 571, 603 (Bankr. S.D.N.Y. 2003)); *see also In re Yukos Oil Co.*, 321 B.R. 396, 401–03 (Bankr. S.D. Tex. 2005); *In re Glob. Ocean Carriers*, 251 B.R. 31, 39 (Bankr. D. Del. 2000).  Additionally, the Debtor holds certain property rights under the Existing Notes Documents and the New Notes indentures, each of which is governed by New York law. *See* Jingrui Declaration, ¶ 51; *Avanti Commc*, 582 B.R. at 610–611; *Berau*, 540 B.R. at 83–84. Accordingly, the Debtor meets the general eligibility requirements of section 109(a) of the Bankruptcy Code.

**B.      The Debtor Meets Specific Eligibility Requirements of Section 1517(a) of the Bankruptcy Code**

54.      Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing, "an order recognizing a foreign proceeding shall be entered if … (1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502; (2) the foreign representative applying for recognition is a person or body; and (3) the petition meets the requirements of section 1515." 11 U.S.C. § 1517(a). Each of these requirements is satisfied for the reasons set forth below.

i.      The BVI Proceeding is a Foreign Proceeding Within the Meaning of Section 1502 of the Bankruptcy Code

55.      Courts in this district have previously recognized schemes of arrangement proceedings and similar proceedings as "foreign proceedings" in the BVI and in offshore jurisdictions that have analogous English-law based frameworks similar to the BVI. *See, e.g., Olinda Star*, 614 B.R. at 40 (recognizing BVI provisional liquidation and scheme of arrangement); *Ocean Rig*, 570 B.R. at 702 (recognizing Cayman provisional liquidation and scheme of arrangement); *Avanti,* 582 B.R. at 614 (recognizing United Kingdom scheme of arrangement); *In re Magyar Telecom B.V.*, No. 13-13508 (SHL) (Bankr. S.D.N.Y. 2013) (same); *In re Ashapura Minechem Ltd.*, No. 11-14668 (JMP) (Bankr. S.D.N.Y. 2011) (recognizing Indian SICA proceeding).

56.      Furthermore, the legal structure governing BVI schemes of arrangement is similar to that governing schemes of arrangement under the laws of the United Kingdom. *See* Ridgers Declaration, ¶¶ 10, 20.  Courts have consistently recognized schemes of arrangement in the United Kingdom as foreign proceedings.  *See Avanti*, 582 B.R. at 619; *In re EnQuest PLC*, No. 16-12983 (MEW) (Bankr. S.D.N.Y. 2016) (ECF No. 14); *In re YH Ltd.*, No. 16-12262 (SCC)

(Bankr. S.D.N.Y. 2016) (ECF No. 14); *In re OIC Run-Off Ltd. & London & Overseas Ins. Co. Ltd.*, No. 15-13054 (SCC) (Bankr. S.D.N.Y. 2016) (ECF No. 18); *In re Towergate Fin. Plc*, No. 15-10509 (SMB) (Bankr. S.D.N.Y. 2015) (ECF No. 16); *In re B. Endeavour Shipping Co. Ltd.*, No. 15-10246 (REG) (Bankr. S.D.N.Y. 2015) (ECF No. 10).  More generally, the scheme of arrangement structure is provided for in the legal regimes of a number of different countries, and "U.S. bankruptcy courts have routinely recognized them as 'foreign proceedings.'" David L. Lawton and Shannon B. Wolf, *The Thing about Schemes in the Scheme of Things: Recognition of Schemes of Arrangement under Chapter 15 of the U.S. Bankruptcy Code*, at 1 (INSOL International Technical Series Issue No. 38, March 2018).

57.    Furthermore, the BVI Proceeding on its face meets all the elements of the definition of a "foreign proceeding" under the Bankruptcy Code.  Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" as "a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or the adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation." 11 U.S.C. § 101(23).  The BVI Proceeding satisfies each element of this definition because (i) it is a proceeding that is (ii) judicial in character, (iii) collective in nature, (iv) in a foreign country, (v) authorized or conducted under a law related to insolvency or the adjustment of debts, (vi) in which the Debtor's assets and affairs are subject to the control or supervision of a foreign court, and (vii) for the purpose of reorganization or liquidation.  Each of these elements is addressed separately and in detail below.

(a)    *The BVI Proceeding is a Proceeding*

58.    The hallmark of a "proceeding" is a "statutory framework that constrains a company's actions and that regulates the final distribution of a company's assets" and includes "acts and formalities set down in law so that courts, merchants and creditors can know them in

advance, and apply them evenly in practice." *In re Betcorp Ltd.*, 400 B.R. 266, 277–78 (Bankr. D. Nev. 2009). The BVI Proceeding is governed by the statutory framework set forth in the BVI Companies Act. Specifically, as described in more detail in the Ridgers Declaration, the BVI Companies Act specifies the acceptable procedures for implementing a BVI scheme, including, among other things, commencing the scheme, designating classes of creditors, holding meetings and voting. *See* Ridgers Declaration, ¶¶ 20–24. The BVI Companies Act, as supplemented by BVI common law, also sets forth the standards for approval of BVI schemes by the applicable BVI court. *See id*. Moreover, in this case, the Convening Order requires that the Debtor provide the Scheme Creditors with access to a copy of the Explanatory Statement, which provides notice and disclosure regarding the procedures to take place in the Scheme. *See id.*, ¶ 29. The BVI Proceeding is therefore a "proceeding" because the BVI Companies Act falls within the type of statutory framework described in applicable case law. *See, e.g.*, *Betcorp*, 400 B.R. at 277–78.

### *(b)      The Foreign Proceeding is Judicial in Character*

59.      The BVI Proceeding is judicial in nature because there is significant judicial involvement in the scheme process. For example, in *In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*, 238 B.R. 25, 52 (Bankr. S.D.N.Y. 1999), this Court stated, "there is significant judicial involvement in this [Bermuda-administered] scheme process[es]." Specifically, the *Hopewell* decision looked to the following elements of the scheme of arrangement process as demonstrating that it was judicial in character:

> There are two mandatory court appearances, the first, on the ex parte summons to convene the class meetings and the second, on the sanctioning of the scheme.... Both hearings required the court to review the materials submitted and evaluate them.... With regard to the second hearing, … the court plays a significant role in that it must assure itself that the scheme is in the best interests of creditors and

members. Lastly, creditors and members had a plethora of opportunities to object
to the scheme before it was sanctioned ....

*Id.* at 52*.*

60.    Here, the Scheme is being administered in a substantially similar manner as
described above in *Hopewell* with the Convening Hearing having already taken place and the
Sanction Hearing scheduled for March 10, 2022.  *See* Ridgers Declaration, ¶ 52.  Further, before
the BVI Court sanctions the Scheme, it must be satisfied that the compromise or arrangement
proposed under the scheme of arrangement is such that an intelligent and honest person, being a
member of the relevant class of scheme creditors concerned and acting in respect of his interests,
might reasonably approve it.  *See id.*, ¶ 33; *Avanti*, 582 B.R. at 610.  Absent the BVI Court's
sanction, the Debtor cannot implement the Scheme.  Ridgers Declaration, ¶ 23.  For the foregoing
reasons, the Scheme Proceeding is judicial in nature.

*(c)    The Foreign Proceeding is Collective in Nature*

61.    A proceeding is "collective" if it considers the rights and obligations of all
creditors.  *See In re ABC Learning Centres Ltd.*, 445 B.R. 318, 328 (Bankr. D. Del. 2010), *aff'd*,
728 F.3d 301 (3d Cir. 2013); *see also In re ENNIA Caribe Holding N.V.*, 594 B.R. 631, 638 (Bankr.
S.D.N.Y. 2018).  Here, the BVI Proceeding is a statutory procedure under the laws of the BVI that
allows the BVI Court to sanction a compromise or arrangement, which has been voted on by the
relevant class of creditor or member and approved by the requisite majorities in a collective
proceeding.  Ridgers Declaration, ¶ 20.

62.    Furthermore, once the Scheme becomes effective, it will be binding on all Scheme
Creditors.  *See id.*, ¶ 48.  All Scheme Creditors will have the opportunity to attend and vote at the
Scheme Meeting, subject to compliance with the applicable procedures specified in the Convening
Order and the Explanatory Statement.  *See id*., ¶ 30.  Moreover, the BVI Court's entry of the

23

Convening Order providing for a single voting class of Scheme Creditors signals that any differences in their legal rights with respect to the Debtor, both before and after the effectiveness of the Scheme, did not make it impossible for them to consult together in relation to the proposed compromise or arrangement with a view to their common interest, as required by the BVI Companies Act. *See id.*, ¶ 26. The BVI Proceeding is therefore collective in nature.

### (d)     The Foreign Proceeding is Located in a Foreign Country

63.     The BVI Proceeding was commenced before the High Court of the Eastern Caribbean Supreme Court of the British Virgin Islands. Following such commencement, the BVI Court has exercised its authority by, among other things, commencing the Convening Hearing and issuing the Convening Order. Therefore, there can be no doubt that the BVI Proceeding is located in the BVI, a foreign country territory.

### (e)     The Foreign Proceeding is Authorized or Conducted Under Law Related to Insolvency or the Adjustment of Debts

64.     The BVI Proceeding is authorized and being conducted under the BVI Companies Act, which is the BVI law that governs schemes of arrangement in the BVI. *See* Ridgers Declaration, ¶ 18. More specifically, the BVI Companies Act provides for a wide range of corporate restructurings by way of court approval, including schemes of arrangement. *See id*. Further, a scheme of arrangement under the BVI Companies Act, like an English scheme, is a flexible mechanism that can be used to encompass a large variety of compromises or arrangements between a company and its creditors. In particular, a scheme of arrangement is useful in circumstances in which hold-out creditors seek an advantage as against similarly ranked creditors in work-out negotiations because they enable companies and their creditors in certain instances to obtain court approval to effect restructuring measures without having to obtain approval from 100 percent of the affected creditors. *See id.*, ¶ 20. As noted above, this Court has previously

24

found a BVI scheme of arrangement to be authorized or conducted under a law related to insolvency or the adjustment of debts. *See Olinda Star* 614 B.R. at 45 (holding that a BVI scheme of arrangement was a "foreign proceeding" executed under the BVI Companies Act). Moreover, courts in this district have also recognized many similarly structured schemes of arrangement under the laws of the United Kingdom, after which the BVI Companies Act is modeled. *See* Ridgers Declaration, ¶ 20; *see, e.g.*, *Avanti*, 582 B.R. at 619; *EnQuest*, No. 16-12983 (MEW) (ECF No. 14); *YH Ltd.*, No. 16-12262 (SCC) (ECF No. 14); *OIC Run-Off Ltd.*, No. 15-13054 (SCC) (ECF No. 18); *Towergate Fin.*, No. 15-10509 (SMB) (ECF No. 16); *Endeavour Shipping*, No. 15-10246 (REG) (ECF No. 10).

    (f)    *Under the Foreign Proceeding, the Debtor's Assets and Affairs are Subject to the Control or Supervision of a Foreign Court*

65.    "[T]he requirement that the debtor's assets be subject to the control and supervision of a foreign court does not require that the foreign proceedings play out entirely in a judicial context like cases under the Bankruptcy Code. The ability of a party to ask for court assistance concerning the proceeding is sufficient to satisfy this element." 8 Collier on Bankruptcy, ¶ 1501.03 (16th ed. 2021); *see also In re ENNIA Caribe Holding N.V.*, 594 B.R. 631, 640 (Bankr. S.D.N.Y. 2018) (finding a proceeding subject to supervision of a foreign court where the court's approval was required to initiate or terminate the proceeding, modify certain debtor contracts and compensate estate professionals). Here, the BVI Court plays multiple supervisory roles in the BVI Proceeding. Specifically, the BVI Court possesses the authority to sanction (or decline to sanction) the Scheme following the Sanction Hearing, and thereby determines whether or not the Debtor will obtain the relief sought. *See* Ridgers Declaration, ¶ 32. In addition, Scheme Creditors and other creditors will have the opportunity to seek the assistance of the BVI Court by raising objections at the Sanction Hearing. *See id.*, ¶ 34. Moreover, the Scheme provides that BVI courts,

including the BVI Court, will have exclusive jurisdiction to hear and determine any suit, action or proceeding, and to settle any dispute which arises out of or in connection with the terms of the Scheme or its implementation or out of any action taken or omitted to be taken under the Scheme or in connection with the administration of the Scheme. *See id.*, ¶ 50. The Scheme is therefore subject to the control or supervision of a foreign court.

> (g)    *The Foreign Proceeding is for the Purpose of Reorganization or Liquidation of the Debtor*

66.    As described more fully in the Ridgers Declaration, the purpose of the BVI Proceeding is the restructuring of the debt under the Existing Notes. Ridgers Declaration, ¶ 3. Specifically, the Scheme Creditors will release the Debtor and RiseSun, among others, from their respective obligations and liabilities under or in connection with the Existing Notes Documents and will receive the Scheme Consideration. *Id.*, ¶¶ 45–48. Additionally, the Debtor will issue the New Notes pursuant to and on the effective date of the Scheme. *Id.*, ¶¶ 45–46.

> ii.    The Foreign Proceedings are "Foreign Main Proceedings"

67.    Under section 1502(4) of the Bankruptcy Code, the term "foreign main proceeding" means "a foreign proceeding pending in the country where the debtor has the center of its main interests" ("COMI"). *See, e.g.*, *Ocean Rig*, 570 B.R. at 702 (recognizing foreign main proceeding); *Suntech*, 520 B.R. at 416–17 (same); *In re Fairfield Sentry Ltd.*, 714 F.3d 127 (2d Cir. 2013) (affirming recognition of foreign main proceeding). Absent evidence to the contrary, a debtor's registered office is presumed to be its COMI. 11 U.S.C. § 1516(c); *see also In re Gerova Fin. Grp., Ltd.*, 482 B.R. 86, 91 (Bankr. S.D.N.Y. 2012); *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 130 (Bankr. S.D.N.Y. 2007), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008). Here, the Debtor's registered office is located in BVI, creating a presumption that BVI is the COMI for the Debtor. *See* Jingrui Declaration, ¶ 57.

68.     Although the presumption that the BVI is the COMI of the Debtor can be rebutted, in the event of a COMI challenge, additional factors relevant to the Court's assessment similarly suggest that the BVI is the COMI of the Debtor.  Courts consider a variety of factors when assessing COMI including, "the location of the debtor's headquarters; the location of those who actually manage the debtor … the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whoselaw would apply to most disputes."  *In re SphinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006).  In *SphinX*, this Court explained that these factors should not be applied "mechanically" and "[i]nstead, they should be viewed in light of chapter 15's emphasis on protecting the reasonable interests of parties in interest pursuant to fair procedures and the maximization of the debtor's value." *Id*.  Critically, the *SphinX* court also provided that "because their money is ultimately at stake, one generally should defer . . . to the creditors' acquiescence in or support of a proposed COMI." *Id.*

69.     When determining the "'location of those who actually manage the debtor,' courts consider more than the location of the board of directors of the debtor." *See In re Serviços de Petróleo Constellation S.A.*, 600 B.R. 237, 273 (Bankr. S.D.N.Y. 2019) (finding that location of management analysis should be "flexible" and reflect the realities of a particular business).  Here, although the Debtor's only director does not reside in the BVI, he has played an active role in monitoring and coordinating the Debtor's affairs during the BVI Proceeding.  He has exercised certain powers conferred upon himself by the BVI Court necessary for the implementation of the restructuring, including the oversight of the Debtor's development of the Scheme.  Jingrui Declaration, ¶ 57.  In addition, the Debtor maintains its books and records in the BVI.  *Id.*

70.    The statutory presumption that the Debtor's COMI is in the BVI is also consistent with the expectations of the Debtor's creditors and other interested parties.  Specifically, the Existing Notes Documents identify the Debtor as a company incorporated in the BVI and the Exchange Offer solicitation package disclosed the possibility of commencement of a BVI scheme by the Debtor.  *Id.*.  In addition, holders of more than seventy-five percent (75%) of the Existing Notes expressly agreed to support a BVI restructuring pursuant to the Creditor Support Agreement and the Scheme Creditors overwhelmingly support the Debtor's Restructuring with over seventy-five percent (75%) of Existing Notes having delivered instructions to the Tender Agent to vote in favor of the Scheme.  *See id*.  This Court should therefore consider "defer[ing], therefore, to the creditors' acquiescence in or support of" the Debtor's COMI being located in the BVI.  *SphinX*, 351 B.R. at 117.

71.    Accordingly, because the Debtor's COMI is located in the BVI, the BVI Proceeding is a "foreign main proceeding" and the first element of section 1517(a) of the Bankruptcy Code is satisfied.

        iii.    <u>In the Alternative, the Court Should Find that the Foreign Proceeding is a "Foreign Nonmain Proceeding"</u>

72.    While the BVI Proceeding clearly satisfies the statutory requirement for a foreign main proceeding, out of an abundance of caution, the Debtor seeks, in the alternative, recognition of the BVI Proceeding as a foreign nonmain proceeding.  Courts recognize a foreign proceeding as a "foreign nonmain proceeding" if "the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending." 11 U.S.C. § 1517(b)(2). Section 1502(2) defines "[e]stablishment" as "any place of operations where the debtor carries out a nontransitory economic activity."  *In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 70 (Bankr. S.D.N.Y. 2011), *aff'd* 474 B.R. 88 (S.D.N.Y. 2012) ("<u>Millennium</u>

<u>Glob. I</u>").    Additionally, courts have required proof of more than a "mail-drop presence."

*Serviços de Petróleo*, 600 B.R. at 277 (citation omitted); 11 U.S.C. § 1502(2).    At least one

court—noting the "paucity of U.S. authority" on the subject—has favorably cited a "persuasive"

English law holding that the presence of an asset and minimal management or organization

can create a debtor establishment.  *See Millennium Glob*. *I*, 458 B.R. at 84–85 (citing *Shierson*

*v. Vlieland-Boddy*, [2005] EWCA Civ. 974, [2005] W.L.R. 3966 (2005)).

73.    As with COMI, whether the debtor has an "establishment" in a country is

determined at the time of filing the chapter 15 petition.  *See Beveridge v. Vidunas (In re O'Reilly)*,

598 B.R. 784, 803 (Bankr. W.D. Pa. 2019) (adopting *Fairfield Sentry* and *In re Ran* findings that

"the presumptive date from which [a c]ourt is to ascertain [a] debtor's center of main interests

and/or establishment is the date the Chapter 15 petition was filed").  Several factors "contribute to

identifying an establishment: the economic impact of the  debtor's operations on the market,

the maintenance of a 'minimum level of organization' for a period of time, and the objective

appearance to creditors whether the debtor has a local presence."  *Millennium Glob*. *I*, 458 B.R.

at 32.  Showing impact of the debtor's activities on the foreign jurisdiction involves a "showing

of a local effect on the marketplace."  *In re Creative Fin., Ltd.*, 543 B.R. 498, 520 (Bankr.

S.D.N.Y. 2016).[7]  This is evidenced by, among other things, engagement of "local counsel and

commitment of capital to local banks,"  *Millennium Glob*. *I*, 458 B.R. at 86–67.

74.    In this case, the BVI is not merely a letterbox jurisdiction for the Debtor.

The Scheme has centralized the Debtor's restructuring activities in the BVI.  Jingrui Declaration,

¶ 58.  Additionally, the Foreign Representative has played an active role in overseeing and

---

[7] In *Creative Finance*, this Court found that the minimal acts performed by the liquidator were insufficient to support a BVI establishment.  Those concerns are inapplicable to this case because the Foreign Representative has diligently undertaken the tasks that the BVI Court authorized him to perform, as discussed above.  Moreover, the *Creative Finance* Court premised its decision on certain findings of bad faith, which are not present here.

managing the Debtor's affairs and evaluating the proposed Restructuring, and has supported numerous filings and applications to the BVI Court. *Id.* These facts are sufficient to, at a minimum, support the finding of an "establishment" in the BVI. S*ee, e.g.*, *Servicos de Petroleo* 600 B.R. at 278, 281–82 (recognizing that "COMI is a flexible determination and not a rigid application of factors" and finding that certain debtor subsidiaries had substantial and non-transitory ties to Brazil, which was sufficient to create an establishment in Brazil for a Luxembourg-based parent).

75.    Denying recognition of the BVI Proceeding as either a foreign main or nonmain proceeding would leave the Debtor without access to U.S. courts. Such a result would be at odds with the purpose of chapter 15 of the Bankruptcy Code—to engender cooperation among foreign courts with respect to restructuring and insolvency proceedings. *See Millennium Glob. I*, 458 B.R. at 69, 81–82.

> iv.    The Chapter 15 Case Has Been Commenced by a Duly Authorized Foreign Representative

76.    The Petitioner is duly authorized to serve in his capacity as foreign representative in this Chapter 15 Case and, as such, satisfies the second condition for entry of an order recognizing such proceeding under section 1517(a) of the Bankruptcy Code. The term "foreign representative" is defined under section 101(24) of the Bankruptcy Code as "a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." Additionally, bankruptcy courts may presume that the person petitioning for chapter 15 recognition is a foreign representative if the decision or certificate from the foreign court so indicates. *See* 11 U.S.C. § 1516(a); *Ocean Rig*, 570 B.R. at 700; *In re SphinX, Ltd.*, 351 B.R. 103, 116–17 (Bankr. S.D.N.Y. 2006), *aff'd sub nom. Krys v. Official Comm. of*

*Unsecured Creditors of RefcoInc. (In re SphinX Ltd.)*, 371 B.R. 10 (S.D.N.Y. 2007) (holding that section 101(24) of Bankruptcy Code was satisfied where foreign representatives submitted a "copy of [a Cayman court's] order appointing them to administer the [d]ebtors' winding up under [Cayman law] and authorizing their commencement of these chapter 15 cases").

77.      Here, pursuant to the Convening Order and written resolution of the Debtor, the Foreign Representative was authorized by the BVI Court and the Debtor to act as the Debtor's agent in seeking any relief available to a "foreign representative" under chapter 15 of the Bankruptcy Code, including, among other things, to seek recognition of the Scheme. Jingrui Declaration, ¶ 49.  This Court has previously acknowledged that persons authorized by foreign courts to serve as foreign representatives under U.S. bankruptcy proceedings constitute "foreign representatives" under the Bankruptcy Code.  *See, e.g.*, *Olinda Star Ltd.*, 614 B.R. at 40 (finding that a legal person authorized by a BVI court to serve as scheme administrator and foreign representative was a "foreign representative" under the Bankruptcy Code); *Ocean Rig*, 570 B.R. at 701 (holding that "duly authorized representative[s] of the [Foreign Debtors]" in a Cayman proceeding were "foreign representatives" under the Bankruptcy Code); *Avanti*, 582 B.R. at 614–15 (providing that an individual authorized as a foreign representative by the debtor's board of directors and the debtor's UK proceeding was a "foreign representative" under the Bankruptcy Code).  Accordingly, the Petitioner is a proper "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code.

### C.      The Petition for Recognition Meets the Requirements of Section 1515 of the Bankruptcy Code and Bankruptcy Rule 1007(a)(4)

78.      This Chapter 15 Case was duly and properly commenced as required by section 1504 of the Bankruptcy Code by filing a petition for recognition pursuant to

section 1515(a) of the Bankruptcy Code. Moreover, pursuant to section 1515(b) of the Bankruptcy Code, a petition for recognition must be accompanied by one of the following:

i.     a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

ii.    a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

iii.   in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

79.    A copy of the Sole Director Resolution authorizing commencement of this Chapter 15 Case is attached to the Jingrui Declaration as **Exhibit A**. Additionally, as discussed above, the Convening Order (attached to the Jingrui Declaration as **Exhibit B**) constitutes a decision of the BVI Court commencing the BVI Proceeding and appointing the Petitioner as the Foreign Representative.

80.    The filed petition for recognition was accompanied by all fees, documents and information required by the Bankruptcy Code and the Bankruptcy Rules, including (i) a corporate ownership statement containing the information required by Bankruptcy Rule 7007.1; (ii) a list containing (a) the names and addresses of all persons or bodies authorized to administer foreign proceedings of the Debtor, (b) all parties to litigation pending in the United States in which the Debtor is a party at the time of the filing of this Chapter 15 Case and (c) all entities against whom provisional relief is being sought under section 1519 of the Bankruptcy Code; (iii) a statement identifying all foreign proceedings with respect to the Debtor that are known to the Foreign Representative; and (iv) a certified copy of the Convening Order. *See* Supporting Documents, filed contemporaneously herewith.

81.     Having filed the above-referenced documents and because the Court is entitled to presume the authenticity of such documents filed in connection with the petition for recognition under section 1516(b) of the Bankruptcy Code, the requirements of section 1515 of the Bankruptcy Code and Bankruptcy Rule 1007(a)(4) have been met and this Chapter 15 Case was properly commenced.   *See* 11 U.S.C. §§ 1504, 1509(a), 1515; Bankruptcy Rule 1007(a)(4).

82.     As demonstrated above, the Debtor also meets both the general eligibility requirements of section 109(a) of the Bankruptcy Code and the specific eligibility requirements of section 1517(a) of the Bankruptcy Code.   Therefore, the Debtor is eligible for chapter 15 relief.

## II.     Enforcement of the Sanction Order and Scheme and Related Discretionary Relief Pursuant to Section 1521 Is Proper

83.     The Foreign Representative respectfully requests that the Court provide for enforcement in the United States of the Scheme and the BVI Orders, including provisions therein approving the Scheme and the Scheme Restructuring pursuant to section 1521(a) of the Bankruptcy Code.

84.     Upon recognition of a foreign proceeding as a foreign main proceeding, certain provisions of the Bankruptcy Code are made applicable automatically to a chapter 15 case as a matter of right pursuant to section 1520 of the Bankruptcy Code.   In addition to these protections, a foreign representative may request additional "appropriate relief" pursuant to section 1521(a) of the Bankruptcy Code, including "any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a) [of the Bankruptcy Code]."   11 U.S.C. § 1521(a)(7).   Section 1521(a) of the Bankruptcy Code authorizes the Court to grant "any appropriate relief" to a foreign representative "where necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of the creditors," provided that the interests of creditors and other interested entities are sufficiently

33

protected. 11 U.S.C. §§ 1521(a), 1522(a); *see also Avanti*, 582 B.R. at 612 ("The discretion that is granted is exceedingly broad, since a court may grant any appropriate relief that would further the purposes of chapter 15 and protect the debtor's assets and the interests of creditors.") (internal citations omitted).  Such relief may include:

a.     staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a);

b.     staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a);

c.     suspending the right to transfer, encumber, or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a);

d.     providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

e.     entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative or another person, including an examiner, authorized by the court;

f.     extending relief granted under section 1519(a); and

g.     granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550 and 724(a).

11 U.S.C. § 1521(a).

85.     The Court's authority to grant each form of relief requested pursuant to section 1521 of the Bankruptcy Code is subject to the same two overlapping conditions because section 1521(a) provides that any relief granted pursuant to section 1521 must be "necessary to effectuate the purposes of [chapter 15] and to protect the assets of the debtor," and the Court must be satisfied that "the interests of creditors and other interested entities, including the debtor, are sufficiently protected."  11 U.S.C. § 1522(a).

86.     A determination of sufficient protection "requires a balancing of the respective

parties' interests." *In re AJW Offshore, Ltd.*, 488 B.R. 551, 559 (Bankr. E.D.N.Y. 2013)

(citing *SNP Boat Serv. S.A. v. Hotel Le St. James*, 483 B.R. 776, 784 (S.D. Fla. 2012); *In re*

*Qimonda AG Bankr. Litig.*, 433 B.R. 547, 556–58 (E.D. Va. 2010); *CT Inv. Mgmt. Co. v. Cozumel*

*Caribe, S.A. de C.V.*, 482 B.R. 96, 108 (Bankr. S.D.N.Y. 2012).   Courts have also explained

"sufficient protection" as:

> embodying three basic principles: '[(i)] the just treatment of all holders of claims
> against the bankruptcy estate, [(ii)] the protection of U.S. claimants against
> prejudice and inconvenience in the processing of claims in the [foreign] proceeding,
> and [(iii)] the distribution of proceeds of the [foreign] estate substantially in
> accordance with the order prescribed by U.S. law.'

*In re ENNIA Caribe Holding N.V.*, 596 B.R. 316, 322-23 (Bankr. S.D.N.Y. 2019) (quoting *In re*

*Atlas Shipping A/S*, 404 B.R. 726, 740 (Bankr. S.D.N.Y. 2009) (quoting *In re Artimm, S.r.L.*,

335 B.R. 149, 160 (Bankr. C.D. Cal. 2005))).

87.     Here, both the three-factor *Atlas Shipping* test and the general balancing test favor

granting the requested relief.

### A.     Just Treatment of All Holders of Claims Against or Interests in the Debtor's Property

88.     The requirement to reasonably assure "just treatment of all holders of claims against

or interests in the debtor's property" is satisfied where the applicable foreign insolvency law

provides a comprehensive procedure for the orderly resolution of claims and the equitable

distribution of assets among all of the estate's creditors in one proceeding.  *See, e.g.*, *In re Bd. of*

*Dirs. of Telecom Arg., S.A.*, 528 F.3d 162, 170 (2d Cir. 2008) ("The 'just treatment' factor is

satisfied upon a showing that the applicable law 'provides for a comprehensive procedure for the

orderly and equitable distribution of [the debtor]'s assets among all of its creditors'") (citing *In re*

*Treco*, 240 F.3d 148, 158 (2d Cir. 2001)); *In re Culmer*, 25 B.R. 621, 629 (Bankr. S.D.N.Y. 1992).

89.     Here, the implementation of the Scheme will result in the Scheme Creditors

receiving the Scheme Consideration, as described in greater detail above, the Jingrui Declaration

and in the Explanatory Statement.  The Scheme will result in the same treatment for each Scheme

Creditor as other similarly situated Scheme Creditors.  Moreover, the terms of the Scheme require

approval of the BVI Court in the form of the Sanction Order.  Hence, the Scheme and Sanction

Order, once entered, will be the result of a proceeding (*i.e.*, the BVI Proceeding) in which all

creditors were treated fairly and justly in compliance with BVI law.

### B.     Protection of Claim Holders in the United States Against Prejudice and Inconvenience in the Processing of Claims in the Foreign Proceeding

90.     The Scheme addresses only the claims of the Scheme Creditors, and there is no

need for any Scheme Creditor to file a claim in the BVI Proceeding to receive the same treatment

as other similarly situated Scheme Creditors.  Accordingly, no creditor in the United States will be

required to process a claim in the foreign proceeding and accordingly no creditor is

inconvenienced thereby.  In any event, all Scheme Creditors were given adequate notice of the

Scheme, and the process for participating in or objecting to the Scheme is the same for United

States creditors as all other creditors.  To the extent participating in or objecting to the Scheme is

analogous to filing a claim, this factor is satisfied.  *C.f. Treco*, 240 F.3d at 158; *In re Petition of

Hourani*, 180 B.R. 58, 68 (Bankr. S.D.N.Y. 1995) (holding that this factor is satisfied where

creditors are given adequate notice of timing and procedures for filing claims, and such procedures

do not create any additional burdens for a foreign creditor to file a claim).

### C.     Distribution of Proceeds Substantially in Accordance with the Bankruptcy Code

91.     The third factor considers whether distribution of the Debtor's property will

substantially accord with the order of distribution available under the Bankruptcy Code.

The "substantially in accordance" factor does not require that the foreign distribution be identical

36

to United States bankruptcy law. *In re Ionica PLC*, 241 B.R. 829, 836 (Bankr. S.D.N.Y. 1999) ("Section 304(c)(4) only requires that the foreign distribution scheme be 'substantially in accordance' with United States bankruptcy law; it does not have to mirror the United States distribution rules.") (citations omitted). Here, as described in more detail above and in the Explanatory Statement, the Debtor seeks to restructure the Debtor and RiseSun's liabilities under the Existing Notes. The Scheme Creditors will release the Debtor and RiseSun, among others, from their respective obligations and liabilities under or in connection with the Existing Notes. In so doing, the Scheme Creditors will receive the Scheme Consideration. The Scheme does not contemplate any other class of creditors, and no other creditors are anticipated to receive the Scheme Consideration. Accordingly, the priority in right of payment and in distribution of the Scheme Consideration is effectively the same as the manner in which such rights and distributions would be made under the Bankruptcy Code.

### D.    The General Balancing Test Weighs in Favor of Granting Relief

92.    With respect to the general balancing test, the Debtor and the Scheme Creditors have a strong interest in the availability of a means to determine how property will be distributed in a collective proceeding because "[t]he equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding." *In re Atlas Shipping A/S*, 404 B.R. 726, 737 (Bankr. S.D.N.Y. 2009). As discussed above, the Scheme is an appropriate mechanism to achieve this important goal. The requested relief, including enforcement of the Scheme and the Scheme Restructuring, is necessary to effectively utilize this mechanism. Moreover, sanction of the Scheme requires that greater than a fifty percent (50%) majority in number of Scheme Creditors, representing at least seventy-five percent (75%) in value of the relevant creditors of the Debtor present and voting at the Scheme Meeting, vote in favor of

the Scheme.  Further,  in this instance, holders of more than seventy-five percent (75%) of the Existing Notes expressly agreed to support a BVI restructuring pursuant to the Creditor Support Agreement.  Such creditors have a significant interest in receiving the benefits of the proposed Restructuring, of which the Scheme is  an  integral  component.  On the other side of the ledger, any objecting creditors will still receive the same treatment as other similarly situated creditors and  will  benefit  from  the  procedural  protections  available  in  the  BVI  Proceeding, so these creditors' interests are protected.  Moreover, the Debtor's primary creditors in the United States are holders of Existing Notes that were issued in connection with the Existing Notes Documents that  clearly identified the Debtor as a BVI company, which could reasonably be expected  to  be subject to BVI proceedings including schemes of arrangement.  Accordingly, these creditors had ample notice of  the  possibility  of  such  a  collective  proceeding  if  the  Debtor encountered financial difficulties and balancing  the  interests  of  the  relevant  parties  strongly supports the conclusion that the relevant parties  in  interest  are  sufficiently  protected  by  the procedures identified herein.

93.    Finally,  the  relief  requested  here  clearly  furthers  the  goals  and  purposes  of chapter 15 itself.  *See*  11 U.S.C. § 1501 (explaining that chapter 15 filing's "objectives" include "cooperation between (A) courts of the United States … and (B) the courts and other competent authorities of foreign countries").  By ensuring that the Debtor can effectuate the terms of the Scheme, particularly with respect to distribution of Scheme Consideration, once approved by the BVI Court, the relief requested "would assist in the efficient administration of this cross-border insolvency proceeding, and would not harm the interests of the [Debtor] or [its] creditors."  *In re Grant Forest Prods., Inc.*, 440 B.R. 616, 621(Bankr. D. Del. 2010).

94.     Accordingly, the Foreign Representative respectfully submits that enforcement of the Scheme is necessary and appropriate.

### III.     Enforcement of the Scheme is Also Proper Under Section 1507

95.     The Court may act pursuant section 1507 of the Bankruptcy Code to provide "additional assistance" to foreign representatives, provided that such assistance is "consistent with the principles of comity" and cooperation with foreign courts. 11 U.S.C. § 1507; *see also Avanti,* 582 B.R. at 615*; In re Atlas Shipping A/S*, 404 B.R. 726, 737-38 (Bankr. S.D.N.Y. 2009); *Bear Stearns*, 374 B.R. at 130.

96.     In exercising discretion to grant relief under section 1507(a) of the Bankruptcy Code, courts are guided by the standards set forth in section 1507(b) of the Bankruptcy Code, which provide that:

> In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with  the principles of comity, will reasonably assure—

  i.   just treatment of all holders of claims against or interests in the debtor's property;

  ii.   protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

  iii.   prevention of preferential or fraudulent dispositions of property of the debtor;

  iv.   distribution of proceeds of the debtor property substantially in accordance with the order prescribed by this title; and

  v.   if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b).

97.     Courts have held that principles of comity are key to determining whether to grant additional assistance.  *See, e.g.*, *In re Metcalfe & Mansfield Alt. Inv.*, 421 B.R. 685, 696

(Bankr. S.D.N.Y. 2010) ("Section 1507 directs the court to consider comity in granting additional assistance to the foreign representative"); *Atlas Shipping*, 404 B.R. at 738 (noting that post-recognition relief is "largely discretionary and turns on subjective factors that embody principles of comity") (quoting *Bear Stearns*, 389 B.R. at 333).

98.      As discussed above, the relief requested is consistent with the goals of international cooperation and assistance to foreign courts embodied in chapter 15 of the Bankruptcy Code, and is necessary to the implementation of the Scheme.

99.      As the Second Circuit has recognized, "[t]he equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail." *Victrix S.S. Co., SA. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713-14 (2d Cir. 1987); *see also Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 458 (2d Cir. 1985) ("The granting of comity to a foreign proceeding enables the assets of a debtor to be dispersed in an equitable, orderly and systematic manner, rather than in a haphazard, erratic or piecemeal fashion.").  Over a hundred years ago, the Supreme Court recognized the need to give effect to foreign schemes of arrangement in order to further these goals, reasoning that:

> [u]nless all parties in interest, wherever they reside, can be bound by the arrangement which it is sought to have legalized, the scheme may fail. All home creditors can be bound. What is needed is to bind those who are abroad. Under these circumstances the true spirit of international comity requires that schemes of this character, legalized at home, should be recognized in other countries.

*Canada S. Ry. Co. v. Gebhard*, 109 U.S. 527, 539 (1883).  If this Court refuses to enforce the Scheme in the United States, Scheme Creditors may pursue claims against the Debtor thereby jeopardizing the uniform and orderly rescheduling of the financial affairs of the Debtor contemplated by the Scheme.

**IV.     Enforcement of the Foreign Plans is Consistent with Principles of Comity**

100.     Courts in this district have routinely held that recognizing and enforcing a foreign

plan and confirmation order falls within the scope of the relief available under section 1521 and

section 1507 of the Bankruptcy Code.   *See, e.g.*, *U.S. Steel*, 571 B.R. at 609; *In re Cell*

*C Proprietary Ltd.*, 571 B.R. 542, 551 (Bankr. S.D.N.Y. 2017); *In re Rede Energia S.A.*, 515 B.R.

69 (Bankr. S.D.N.Y. 2014).   In particular, this Court has enforced a BVI scheme in the United

States.   *Olinda Star*, 614 B.R. 28 (enforcing a BVI scheme of arrangement).   In addition, this Court

has also explained in detail why a United Kingdom scheme of arrangement and associated sanction

order may properly be recognized and enforced in the United States.   *See Avanti*, 582 B.R. at 619.

As discussed above, the structure of United Kingdom schemes is acutely similar to that of BVI

schemes.

101.     The decision of whether to grant appropriate relief or additional assistance by

enforcing a scheme and sanction order is "guided by principles of comity and cooperation with

foreign courts."   *Avanti*, 582 B.R. at 616.   The need to extend comity to foreign proceedings is

particularly salient with respect to proceedings such as the BVI Proceeding that determine how

property will be distributed in a collective proceeding because "[t]he equitable and orderly

distribution of a debtor's property requires assembling all claims against the limited assets in a

single proceeding" to bind all creditors and comprehensively effectuate a plan of reorganization.

*Atlas Shipping*, 404 B.R. at 737 (quoting *Victrix S.S. Co. v. Salen Dry Cargo A.B.*, 825 F.2d 709,

713–14 (2d Cir. 1987)); *Gebhard*, 109 U.S. at 539 ("Unless all parties … can be bound by the

arrangement … the scheme may fail ….   Under these circumstances the true spirit of international

comity requires that schemes of this character, legalized at home, should be recognized");

*Victrix S.S. Co.*, 825 F.2d at 714 ("The equitable and orderly distribution of a debtor's property

requires assembling all claims against the limited assets in a single proceeding; if all creditors

could not be bound, a plan of reorganization would fail").

102.   Comity is particularly important in the insolvency context notwithstanding the

fact that recognition of a foreign restructuring proceeding may implicate certain rights under U.S.

law.   For example, in *In re. Bd. of Dirs. of Telecom Arg., S.A.*, then-Second Circuit Judge

Sotomayor affirmed a bankruptcy court's order extending comity to Argentine insolvency

proceedings, finding that those proceedings did not violate U.S. public policy considerations

manifest in the Trust Indenture Act ("TIA").   *Telecom Arg.*, 528 F.3d 162, 165 (2d Cir. 2008).

The Second Circuit held that a bankruptcy court may grant enforcement of foreign insolvency

proceedings that result in the restructuring of TIA-qualified notes so long as recognition of those

proceedings is otherwise valid under then-section 304 of the Bankruptcy Code. Foreign

insolvency proceedings can also modify payment terms under an indenture notwithstanding

noteholders' TIA rights.  *See In re Bd. of Dirs. of Multicanal S.A.*, 307 B.R. 384 (Bankr. S.D.N.Y.

2004). Citing prior Supreme Court precedent, Judge Gropper rejected claims by noteholders:

> [I]f foreign law can under certain circumstances trump the U.S. Constitution and
> preclude bondholders from enforcing their contractual rights, as *Gebhard* holds,
> there is no basis for adopting the principle espoused by [the noteholders], that
> foreign law can under no circumstances override § 316(b) of the Trust Indenture
> Act (except perhaps if the foreign law is identical in all respects to U.S. law). Nor
> can *Gebhard* be limited to the effect of a foreign proceeding on State rather than
> Federal rights. It is the seminal decision on granting comity to foreign insolvency
> proceedings.

*Id.* at 390.

103.   In that regard, the Supreme Court has held that a foreign judgment should not be

challenged in the United States if the foreign forum provides:

> [A] full and fair trial abroad before a court of competent jurisdiction, conducting
> the trial upon regular proceedings, after due citation or voluntary appearance of
> the defendant, and under a system of jurisprudence likely to secure an impartial
> administration of justice between the citizens of its own country and those of

> other countries, and there is nothing to show either prejudice in the court, or in the
> system of laws under which it is sitting ….

*Hilton* v. *Guyot*, 159 U.S. 113, 202–03 (1895); *see also Avanti*, 582 B.R. at 618–619
(extending comity to a sanctioned scheme that: complied with applicable statutory requirements;
fairly represented creditors in classification; found the majority acted in a *bona fide* manner; was
one that an intelligent and honest man, acting in respect of his interests as a creditor, might
reasonably approve; and where jurisdiction was proper); *Metcalfe*, 421 B.R. at 698 (holding that a
Canadian order approving a release and injunction was enforceable in chapter 15 under
principles  ofcomity because "[t]he U.S. and Canada share the same common law traditions and
fundamental principles of law.  Canadian courts afford creditors a full and fair opportunity to be
heard in a manner consistent with standards of U.S. due process.  U.S. federal courts have
repeatedly granted comity to Canadian proceedings."); *In re Sino-Forest Corp.*, 501 B.R. 655,
663–64 (Bankr. S.D.N.Y. 2013) ("The same analysis [as *Metcalfe*], with the same  conclusions,
applies here.").

104.    The BVI Proceeding easily meets the standard for extending comity.  The facts and
circumstances here are very similar to those in *Metcalfe* and *Sino-Forest*.  The United States and
the BVI, as a territory of the United Kingdom, share the same common law traditions and
fundamental principles of law.  *See, e.g.*, *Olinda Star*, 614 B.R. at 47 (finding that the
"United States and [the BVI] share common-law traditions and fundamental principles of law,
including an emphasis on procedural fairness").  Moreover, in the BVI Proceeding in particular,
the Scheme Creditors have a full and fair opportunity to vote on and be heard in connection with
the Scheme, in a manner consistent with U.S. standards of due process.  *See* Ridgers Declaration,
¶ 34.  The Scheme, similar to United Kingdom schemes, requires a greater than fifty percent (50%)
majority in number representing not less than seventy-five percent (75%) in value of the single

class of Scheme Creditors present and voting, in person or by proxy, at the Scheme Meeting to

vote in favor of the Scheme to be legally binding. *See id.*, ¶ 30; *see also Avanti*, 582 B.R. at 618–

19 (recognizing a foreign scheme with the same voting requirements).  Accordingly, enforcing

the Scheme and Sanction Order as appropriate relief or additional assistance under section 1521

or 1507 is an appropriate exercise of comity.

## V.   The Standard for Injunctive Relief is Satisfied with Respect to Enforcement of the Scheme

105.    Pursuant to section 1521(e) of the Bankruptcy Code, the standard for injunctive

relief under federal law applies in chapter 15 cases.  11 U.S.C. § 1521(e).  To obtain a permanent

injunction, a movant must demonstrate that (i) an injunction is required to avoid irreparable harm

and (ii) there is a likelihood of success on the merits.  *See Clarkson v. Coughlin*, 898 F. Supp.

1019, 1035 (S.D.N.Y. 1995).

106.    With respect to the second factor, the Foreign Representative seeks injunctive relief

enforcing the Scheme and the BVI Orders in the United States only upon recognition thereof as

part of the Proposed Recognition Order.  Therefore, at the time such discretionary relief is granted,

the requirement that the movant succeeds on the merits will be satisfied.

107.    With respect to the first factor, irreparable harm exists where the orderly and

equitable determination of claims and distribution of a debtor's assets could be disrupted absent

injunctive relief.  *See, e.g.*, *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713–14

(2d Cir. 1987) ("The equitable and orderly distribution of a debtor's property requires assembling

all claims against the limited assets in a single proceeding; if all creditors could not be bound,

a plan of reorganization would fail."); *In re Garcia Avila*, 296 B.R. 95, 114 (Bankr. S.D.N.Y.

2003); *In re MMG LLC*, 256 B.R. 544, 555 (Bankr. S.D.N.Y. 2000) ("The guiding principle of

bankruptcy law is equality of distribution …. As a rule, therefore, irreparable harm exists whenever

local creditors of the foreign debtor seek to collect their claims or obtain preferred positions to the detriment of the other creditors."); *In re Rubin*, 160 B.R. 269, 283 (Bankr. S.D.N.Y. 1993) (quoting *In re Lines*, 81 B.R. 267, 270 (Bankr. S.D.N.Y. 1988) ("[T]he premature piecing out of property involved in a foreign liquidation proceeding constitutes irreparable injury.")).

108.   As discussed above in the context of demonstrating that enforcement of the Scheme and the Scheme Restructuring contemplated thereby is appropriate, an injunction enforcing the terms of the Scheme and the BVI Orders in the United States is necessary to prevent Scheme Creditors or other entities from seeking to obtain judgments in the United States against the Debtor or other parties who receive relief from the Scheme to obtain greater recoveries than those to which they are entitled under the Scheme.  If the Scheme Creditors can effectively evade the terms of the Scheme and the Restructuring by commencing actions in the United States, parties involved in the Restructuring would be required to defend against any such proceedings and deplete the resources of the restructured business to the detriment of the Restructuring.  For these reasons, allowing creditors to re-litigate issues resolved pursuant to the Scheme and BVI Orders in the United States would threaten the success of the Reorganization and cause "irreparable harm" to the Debtor. The granting of the requested relief, conversely, would protect the interests of the Scheme Creditors by maximizing the total value available for distribution and ensuring that claims are determined and paid on a consistent, nondiscriminatory basis in accordance with the terms of the Scheme and BVI Orders.

109.   Both prior to and since the enactment of chapter 15, courts have readily granted permanent injunctive relief to enforce foreign restructuring plans and discharges.  *See, e.g.*, *In re Rede Energia S.A.*, 515 B.R. 69, 93 (Bankr. S.D.N.Y. 2014) ("The request by the Foreign Representative that the Court . . . enjoin acts in the U.S. in contravention of the

45

[foreign confirmation decision] is relief of a type that courts have previously granted under section 304 of the Bankruptcy Code and other applicable U.S. law.") (citing *In re Bd. of Dirs. of Telecom Arg., S.A.*, 528 F.3d 162, 174–76 (2d Cir. 2008)); *Sino-Forest Corp.*, 501 B.R. at 665 (granting permanent injunctive relief to enforce Canadian plan); *Metcalfe*, 421 B.R. at 685 (same).

110.    Additionally, the injunctive relief sought herein would not cause undue hardship or prejudice to the rights of any creditor based in the United States.  In fact, the procedures for participating in and voting on the Scheme under BVI law are applied uniformly to all of the Debtor's creditors, wherever they reside.  Moreover, the panoply of rights of Scheme Creditors to participate in and object to the Scheme in regular proceedings before the BVI Court are discussed above with respect to the recognition of the Scheme.  In short, the injunctive relief sought herein seeks only to give effect to the orderly and equitable implementation of the Scheme and the BVI Orders in the United States.

## VI.   The Relief Requested is Consistent with United States Public Policy and Policy Behind the Bankruptcy Code

111.    The purpose of chapter 15 is set forth in section 1501 of the Bankruptcy Code and includes:

> (1) cooperation between (A) courts of the United States, the United States Trustee, trustees, examiners, debtors, and debtors in possession; and (B) the courts and other competent authorities of foreign countries involved in cross-border insolvency cases; (2) greater legal certainty for trade and investment; (3) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor; (4) protection and maximization of the value of the debtor's assets; and (5) facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

11 U.S.C. § 1501.  Recognizing the BVI Proceeding as a foreign main proceeding comports with all of these objectives.

46

112.    While section 1506 of the Bankruptcy Code provides that nothing in chapter 15 shall prevent the Court from refusing to take an action otherwise required therein if such action would be manifestly contrary to the public policy of the United States, the public policy exception is narrowly construed.   *See, e.g.*, *Sino-Forest*, 501 B.R. at 665; *Metcalfe*, 421 B.R. at 697; *In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1069 (5th Cir. 2012).   Moreover, the public policy exception must be viewed in light of one of the fundamental goals of the Bankruptcy Code—the centralization of disputes involving the debtor.   *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 989 (2d Cir. 1990) ("The Bankruptcy Code provides for centralized jurisdiction and administration of the debtor, its estate and its reorganization in the Bankruptcy Court . . . .") (internal citations and quotation marks omitted).   Indeed, as some courts have noted:

> American courts have long recognized the need to extend comity to foreign bankruptcy proceedings because the equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail.

*Atlas Shipping*, 404 B.R. at 733 (internal quotation marks omitted) (citing *Victrix*, 825 F.2d at 713–14); *see also JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 424 (2d Cir. 2005) ("We have repeatedly held that U.S. courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding.").

113.    Recognition of the BVI Proceeding as a foreign main proceeding will enable the Debtor to fully implement the Restructuring as intended pursuant to the Scheme, facilitate a meaningful distribution for its creditors and enable the business of the Company to continue as reconstituted.

114.    Recognition of the BVI Proceeding also would promote the fair and efficient administration of a cross-border reorganization procedure that protects the interests of all stakeholders and interested parties.   By recognizing the BVI Proceeding and granting the relief

requested, the process of resolving any residual claims against the Debtor would be centralized in the BVI, which is a fundamental goal of the Bankruptcy Code. *See, e.g.*, *Ionesphere*, 922 F.2d at 989; *Cornfeld v. Investors Overseas Servs.*, Ltd., 471 F. Supp. 1255, 1259 (S.D.N.Y. 1979) (noting that "the firm policy of American courts is the staying of actions against a corporation which is the subject of a bankruptcy proceeding in another jurisdiction"). Claims would be treated in accordance with the Scheme that comports with BVI law, which is similar to comparable United States laws, and any disputes would be subject to the uniform jurisdiction of one tribunal—the BVI Court. Recognition will enable the orderly administration of the Debtor's assets and foster cooperation between courts in the BVI and the United States. Such orderly administration is demonstrably consistent with the public policy of the United States and the Bankruptcy Code. If the Scheme sanctioned by the BVI Court is not enforced in the United States, the uniform and orderly administration of the Debtor in the BVI Proceeding would be jeopardized. *See, e.g.*, *Gebhard*, 109 U.S. at 539 (1883)("[u]nless all parties in interest, wherever they reside, can be bound by the arrangement which is sought to have legalized, the scheme will fail. All home creditors can be bound. What is needed is to bind those who are abroad. Under these circumstances the true spirit of international comity requires that schemes of this character, legalized at home, should be recognized in other countries.").

115.    If the Court does not recognize the Scheme, then the BVI Proceeding faces legal uncertainty and the Scheme, and therefore the Restructuring, may not succeed. Additionally, failure to enjoin the Scheme Creditors or enforce the relief provided for in the Scheme in the United States may result in unnecessary enforcement costs or the piecemeal disposition of assets to the detriment of the Debtor and its various stakeholders. The purpose of chapter 15 is to prevent such harms. *See* 11 U.S.C. § 1501(a) (noting that, among other objectives

48

described herein, chapter 15 facilitates "the rescue of financially troubled business" and provides for the "fair and efficient administration of cross border insolvencies").

116.   Avoiding such potential adverse outcomes through the formal recognition of the BVI Proceeding and enforcement of the Scheme and the BVI Orders in the United States effectuates the principal objectives Congress articulated when it enacted chapter 15 of the Bankruptcy Code and otherwise comports with U.S. public policy.

## NOTICE

117.   In accordance with Bankruptcy Rule 2002(q), the Foreign Representative will provide notice of this Motion to (i) the Debtor; (ii) the Office of the United States Trustee for Region 2; and (iii) the parties entitled to notice set forth in the *Motion Pursuant to Fed. R. Bankr. 2002 and 9007 for Order (I) Scheduling Recognition Hearing (II) Setting Objection Deadline, and (III) Approving Form and Manner of Service of Notice*, filed contemporaneously herewith. The Foreign Representative submits that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

## NO PRIOR REQUEST

118.   No previous request for the relief sought herein has been made by the Foreign Representative to this or any other court.

*[Remainder of page intentionally left blank.]*

49

WHEREFORE the Foreign Representative respectfully requests entry of the Proposed Recognition Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: February 14, 2022
      New York, New York

**SIDLEY AUSTIN LLP**

/s/ *Anthony Grossi*
Anthony Grossi
Shafaq Hasan
787 Seventh Avenue
New York, New York 10019
Tel: (212) 839-5300
Fax: (212) 839-5599
Email: agrossi@sidley.com
      shafaq.hasan@sidley.com

*Counsel to the Foreign Representative*