**SIDLEY AUSTIN LLP**
Anthony Grossi
Shafaq Hasan
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| RongXingDa Development (BVI) Limited,[1] | Case No. 22-10175 (DSJ) |
| Debtor in Foreign Proceeding. | |

**DECLARATION OF LIU JINGRUI IN SUPPORT OF**
**THE MOTION FOR (I) RECOGNITION OF FOREIGN MAIN**
**PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE, AND**
**(III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

I, Liu Jingrui, to the best of my information and belief, state as follows:

1.       I am over the age of 18 and, if called upon, could testify to all matters set forth in this declaration (this "Declaration").[2] Pursuant to the Debtor's Sole Director Resolution, I was appointed as the authorized representative of the Debtor by the Debtor's sole director. Moreover, I am also the General Manager of Capital Markets and the General Manager of the Hong Kong office of RiseSun Real Estate Development Co., Ltd., the Debtor's ultimate parent. Consistent

---

[1]  The Debtor is incorporated in the BVI as an exempted limited liability company, and registered with registration number 1999990. The Debtor's registered office is located at Maples Corporate Services (BVI) Limited, Kingston Chambers, PO Box 173, Road Town, Tortola, BVI.

[2]  Capitalized terms used but not defined have such meanings as defined elsewhere in this Declaration.

with these roles, I have gained knowledge of the Debtor's history, day-to-day operations, assets, financial condition, business affairs, and books and records. All facts set forth in this Declaration are based upon (a) my personal knowledge; (b) my review of relevant documents and any and all documents prepared and/or filed in connection with the BVI Proceeding and this chapter 15 case (the "Chapter 15 Case"); (c) information supplied to me by the officers, directors, employees or professionals retained by the Debtor; or (d) based upon my experience and knowledge of the Debtor's assets and financial condition.

2.      I am making this Declaration in accordance with section 1515 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3.      RongXingDa Development (BVI) Limited (the "Debtor") is the subject of a restructuring proceeding entitled *In the Matter of Rongxingda Development (BVI) Limited*, concerning a scheme of arrangement between the Debtor and the Scheme Creditors, currently pending before the High Court of the Eastern Caribbean Supreme Court (the "BVI Court") of the British Virgin Islands (the "BVI") Case Number: BVIHC (COM) 0008 of 2022.

4.      On January 17, 2022, the Debtor's sole director passed the Sole Director Resolution authorizing me to take certain actions as necessary to commence the BVI Proceeding and the Chapter 15 Case. Further, on February 8, 2022, I was appointed and authorized by the BVI Court to act as the Foreign Representative with respect to the BVI Proceeding for the purposes of having the BVI Proceeding recognized in a jurisdiction outside of the BVI, including to apply for recognition of the BVI Proceeding and enforcement of the Scheme in the United States pursuant to chapter 15 of the Bankruptcy Code.

2

5.      I submit this Declaration in support of (a) the *Chapter 15 Petition for Recognition of a Foreign Proceeding* (the "Chapter 15 Petition"); (b) the *Motion for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief under Chapter 15 of the Bankruptcy Code* (the "Recognition Motion"); and, (c) the *Motion Pursuant to Fed. R. of Bankr. P. 2002 and 9007 Requesting Entry of an Order (I) Scheduling the Recognition Hearing, and (II) Approving the Form and Manner of Service of Notice* (the "Scheduling Motion"), filed contemporaneously herewith.

6.      As further detailed herein, a series of events have placed certain Chinese property developers, including the Company, under financial stress and created impediments to address certain payment maturities.  The relief requested of this Court and the financial restructuring effectuated through this Chapter 15 Case and the corresponding BVI Proceeding is a meaningful step to right-size the Company's balance sheet and place it in a position for long-term success to the benefit of the Company's employees, creditors, customers, vendors, and all of its stakeholders.

## BACKGROUND

**I.      The Debtor's Business Operations and Preexisting Capital Structure**

7.      The Debtor was incorporated in the BVI under the BVI Business Companies Act 2004 (the "BVI Companies Act") as an exempted company with limited liability on November 30, 2018.

8.      The Debtor is a non-operating special purpose vehicle that is wholly owned by RiseSun Land Development (Hong Kong) Limited, which is in turn owned by the ultimate parent and holding company RiseSun Real Estate Development Co., Ltd. ("RiseSun" and together with all its various subsidiaries, including the Debtor, the "Company").  The Debtor was incorporated for the purpose of issuing the Existing Notes.

3

9.     The Company is a leading real estate developer in the People's Republic of China (the "PRC"), focusing on developing quality residential properties.  Founded in Hebei province in 1996, the Company has established a strong market position in the Beijing-Tianjin-Hebei Bohai Economic Rim and the Yangtze River Delta Region, and has been actively expanding into the Greater Bay Area and central and western China.  The Company's shares have been listed on the Shenzhen Stock Exchange since 2007.

### A.     The Company's Operation Segments and Business Operations

10.     The Company's business operations are separated into four segments: property development; hotel and resort development and operation; property management; and other miscellaneous sectors.  The Company primarily develops small-to-mid-sized residential properties targeting first-time homebuyers and upgraders.  In addition to the property development business, with a view to diversifying its business portfolio and creating multiple streams of income, the Company also has expanded into other businesses, including, among others, new industry town and development and operations, hotel and resort operations, architectural design, health care, and internet and finance businesses.  The Company's revenue for the year ended December 31, 2020 amounted to RMB$71.51 billion or US$11.23 billion.   The Company's revenue for the nine months ended September 30, 2021 amounted to RMB$45.91 billion or US$7.21 billion.[3]

11.     With respect to the Company's property development segment, the Company develops a variety of quality and residential properties, primarily dwelling-size apartments and mid-and-high-end apartments, that meet the differentiated demands of first-time homebuyers and upgraders.  The Company also develops commercial properties, such as shopping malls and office

---

[3] For the purposes of conversion, this Declaration uses the prevailing currency conversion rates on February 9, 2022.

buildings, integrated with, or in the vicinity of, the residential properties or economic centers. As of June 30, 2021, the Company had a total of 370 property development projects at various stages of development, covering more than eighty-six (86) cities across China. For the six months ended June 30, 2021, revenue from the property development business amounted to RMB$31.58 billion or US$4.96 billion.

12.    Further, the Company engages in hotel and resort development and management to complement its property development business. The Company operates and manages hotels and resorts under five brands, namely Arcadia (阿尔卡迪亚), Rongxi Manor (荣玺庄园), Zuolin Youli (佐邻佑里), Rongxin (荣馨) and Rongyi (荣逸). As of June 30, 2021, the Company had fifty (50) hotels and resorts under its management with over 14,000 rooms. For the six months ended June 30, 2021, revenue from the hotel and resort operation business amounted to RMB$342.10 million or US$53.76 million.

13.    The Company also provides property management services to tenants to expedite their operation and production in the new industry towns. Property management services include gardening and greening, cleaning, security, as well as repair and maintenance services. For the six months ended June 30, 2021, revenue from the property management business amounted to RMB$740.50 million or US$116.37 million.

14.    Lastly, the Company operates certain businesses that include architectural design and finance. The Company has established RiseSun Architectural Design Co., Ltd. (荣盛建筑设计有限责任公司) to provide architectural design, landscape design and interior design services. The Company started its finance business early in 2010 and established a subsidiary RiseSun Taifa (Beijing) Investment Fund Management Company Limited (荣盛泰发

（北京）投资基金管理有限公司). As of June 30, 2021, RiseSun Taifa had established over 100 real estate funds together with banks, trust firms, and state-owned financial institutions, with asset under management of approximately RMB$30.00 billion or US$4.71 billion. For the six months ended June 30, 2021, revenue from other business amounted to RMB$1.56 billion or US$245.17 million.

**B.      The Debtor's Existing Capital Structure and Existing Notes**

15.      As noted, the Debtor is a special purpose entity that was incorporated for the purposes of issuing the following notes:

(a)      An aggregate principal amount of US$500.00 million 8.0% senior notes with a maturity date of April 24, 2022 (the "April 2022 Notes") issued pursuant to an indenture dated April 24, 2019 (the "April 2022 Notes Indenture") between the Debtor as issuer, RiseSun as the parent guarantor, and China Construction Bank (Asia) Corporation Limited as the notes trustee (the "Notes Trustee"); and

(b)      An aggregate principal amount of US$300.00 million 8.95% senior notes with a maturity date of January 18, 2022 (the "January 2022 Notes" and together with the April 2022 Notes, the "Existing Notes") issued pursuant to an indenture dated January 19, 2021 (the "January 2022 Notes Indenture" and together with the April 2022 Notes Indenture and the parent guarantee, the "Existing Notes Documents") entered into between the Debtor as issuer, RiseSun as the parent guarantor, and the Notes Trustee.

16.      The proceeds from the Existing Notes were transferred to RiseSun by way of an intercompany loan (the "Intercompany Loan"). The Debtor has no other significant assets other than the Intercompany Loan and no other significant liabilities apart from its obligations under the Existing Notes.

17.      The Company announced on January 10, 2022 that, from January 14, 2022, the coupon rate on the Existing Notes would increase to 9.5% per annum in respect of the outstanding principal of Existing Notes, equal to the interest rate of the New Notes, and interest accrued at

such rate will be paid on the Transaction Effective Date.

18.    As of January 17, 2022, the total amount outstanding under the April 2022 Notes is US$487.70 million and the total amount outstanding under the January 2022 Notes is US$292.00 million, cumulatively totaling US$779.70 million outstanding under the Existing Notes (the "Total Outstanding Principal Amount").

19.    As further detailed below, on January 18, 2022, in light of the support level for the Creditor Support Agreement and the Debtor's decision to proceed with the Scheme, the Company did not make payment of all amounts due and payable under the January 2022 Notes upon the final maturity date.

20.    Given that the Debtor is a non-operating entity, the payment under the Existing Notes was intended to be paid by RiseSun through operating income, net profit, cash flow from operating activities and other financing sources of the Company.  A decline in property sales and difficulty in obtaining funding from onshore and offshore capital markets, however, precipitated the need for alternative restructuring options.

## II.    Events Preceding the Commencement of the BVI Scheme Proceeding

21.    During the second half of 2021, Chinese property developers and the capital markets that funded the growth and development of the sector have experienced an inflection point. Reduced bank lending for real estate development has resulted in reduced access by property developers to PRC capital.  In addition, reduced bank lending for buyers seeking mortgage financing, as well as buyers' concerns about the ability of property developers to complete projects, has resulted in reduced property sales.  Adverse reaction to these PRC events by international capital markets has limited the Company's funding sources to address

upcoming maturities.

22.    Prior to the commencement of this Chapter 15 Case and the BVI Proceeding, certain commercial bills and wealth management products in the PRC issued or guaranteed by RiseSun and/or its subsidiaries became due and payable.  RiseSun has been actively negotiating with the relevant creditors in order to resolve any issues regarding the payment maturities within a reasonable timeframe.

23.    As the Debtor disclosed in an announcement dated December 10, 2021, the Debtor appointed Haitong International Securities Company Limited and its affiliates, a securities firm in the Hong Kong Special Administrative Region of the PRC, as its financial adviser and Sidley Austin as its legal adviser to review its potential options and to assist the Debtor in its debt restructuring negotiations with the holders of the Existing Notes, in light of the adverse impact of a number of factors, including the COVID-19 pandemic.  RiseSun and the Debtor also encouraged holders of the Existing Notes to come forward and establish contact so the Debtor could initiate consensual restructuring discussions.

### A.    Exchange Offer and Consent Solicitation

24.    Since the appointment of its advisers, the Debtor has been involved in extensive discussions with its financial and legal advisers in relation to the restructuring of the Debtor's liabilities under the Existing Notes.

25.    In light of the Existing Notes maturities and concentration of maturities of the Company's other indebtedness, on December 16, 2021, the Debtor launched an exchange offer and consent solicitation as part of an overall strategy to improve its financial condition, extend its debt maturity profile, strengthen its balance sheet, and improve its cash flow management

8

(the "Exchange Offer and Consent Solicitation").  The Debtor offered certain eligible holders of the Existing Notes the opportunity to, among other things, exchange their Existing Notes for new notes with new terms (a new tenor amongst the new terms) designed to allow the Company as a whole to improve its financial condition and provide the necessary financial stability to continue as a going concern.

26.    Separately, the Debtor also understood that, as an alternative to the Exchange Offer and Consent Solicitation, a restructuring of the Existing Notes could be implemented via a scheme of arrangement under section 179A of the BVI Companies Act.  Accordingly, at the same time as launching the Exchange Offer on December 16, 2021, the Debtor entered into the Creditor Support Agreement, setting out the terms of the restructuring.

27.    Further, by the conclusion of the Exchange Offer and Consent Solicitation, over seventy-five percent (75%) of all Existing Notes were tendered for the Exchange Offer and Consent Solicitation.  The Debtor, however, did not obtain sufficient support from the holders of the Existing Notes to effect the Exchange Offer and Consent Solicitation.  In order to ensure that the Debtor's liabilities under the Existing Notes are comprehensively restructured, on January 10, 2022, the Debtor announced that the Exchange Offer and Consent Solicitation had terminated and that it would seek to effect the restructuring via a scheme of arrangement in the BVI, in accordance with the terms of the Creditor Support Agreement (the "Scheme").

### B.    Creditor Support Agreement[4]

28.    The Debtor also required, as a condition to participate in the Exchange Offer and

---

[4] Capitalized terms used in this section, but not defined are given their meaning under the Creditor Support Agreement.

Consent Solicitation, each holder of the Existing Notes to execute the creditor support agreement (or an accession thereto) in support of a potential scheme of arrangement to restructure the debt under the Existing Notes (the "Creditor Support Agreement" or "CSA").

29.     Under the terms of the CSA, the Debtor and RiseSun have undertaken to pay the Instruction Fee (an amount in cash equal to 1.5% of the aggregate principal amount of the eligible note as of the Instruction Fee Deadline) on the day when all conditions precedent to the Existing Notes restructuring have been satisfied or waived (the "Transaction Effective Date") (or as soon as practicable thereafter) in respect of each of the Existing Notes (providing that, among other conditions, the relevant Consenting Creditor has not committed a material breach of any terms of the CSA and votes in favor of the Scheme at the Scheme Meeting).

30.     By January 7, 2022, the Debtor received Accession Deeds consenting to the CSA from certain Scheme Creditors holding over seventy-five percent (75%) or US$590.18 million in aggregate principal amount of the Existing Notes. On January 10, 2022, the Debtor announced the termination of the Exchange Offer and Consent Solicitation and its intention to implement the restructuring via the Scheme and pursuant to the Creditor Support Agreement to seek a more holistic resolution with respect to the exchange of all the Existing Notes into the New Notes. On January 10, 2022, the Debtor also announced that the Instruction Fee for all Eligible Holders who had validly tendered their Existing Notes for exchange in accordance with the terms of the Exchange Offer and Consent Solicitation and acceded to the Creditor Support Agreement would be increased from 0.5% to 1.5% of the aggregate principal amount of an Existing Note as set out in the Creditor Support Agreement.

III.     **Description of the Scheme and Issuance of New Notes**

31.     As described in further detail under the *Declaration of Alexander Teck Chai*

10

*Ridgers in Support of the Motion for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief under Chapter 15 of the Bankruptcy Code* (the "Ridgers Declaration"), a scheme of arrangement is an arrangement entered into between a company and its creditors, as provided for under section 179A of the BVI Companies Act.  A scheme of arrangement enables a company to enter into a compromise or arrangement in respect of its debts or obligations with its creditors, or one or more classes of its creditors.  A scheme of arrangement is approved by the requisite majorities of creditors if a majority of creditors representing at least seventy-five percent (75%) in value of the relevant creditors of the Debtor present and voting at the scheme meeting vote in favor of such scheme.

32.     Under a scheme of arrangement with its creditors, the Debtor seeks to restructure the Debtor and the Company's liabilities under the Existing Notes.  Pursuant to the CSA and the Exchange Offer and Consent Solicitation, creditors of the Debtor who have claims under the Existing Notes against the Debtor and RiseSun, as the obligors under the Existing Notes (the "Scheme Creditors") will irrevocably, unconditionally, fully and absolutely release the Debtor and RiseSun, among others, from their respective obligations and liabilities under or in connection with the Existing Notes Documents (the "Scheme Restructuring").  In so doing, the Scheme Creditors will receive the following consideration (the "Scheme Consideration"):

(a)     a cash redemption equal to 5% of the outstanding principal amount of the Existing Notes held by each Scheme Creditor as of the Record Time;

(b)     New Notes in an aggregate principal amount equal to ninety-five percent (95%) of the outstanding principal amount of the Existing Notes held by each Scheme Creditor as of the Record Time and, without double counting, any Residual New Notes; and

(c)     accrued and unpaid interest on the Existing Notes up to but excluding the Transaction Effective Date (at a rate of (i) 8.95% per annum in respect of the January 2022 Notes and 8.0% per annum in respect of the April 2022 Notes

up to and including January 13, 2022 and (ii) 9.5% per annum in respect of the Existing Notes from January 14, 2022), in cash.

33.     Additional information about the Scheme is set forth in the explanatory statement for the Scheme (the "Explanatory Statement").[5]

34.     Therefore, pursuant to the Scheme, the Debtor is restructuring its and RiseSun's existing indebtedness under the Existing Notes Documents.  The Debtor will also be issuing new notes on the Transaction Effective Date, consisting of ninety-five percent (95%) of the Total Outstanding Principal Amount, including:

(a)     Notes bearing interest at 9.5% with a tenor of 364 days (the "New 2023 Notes") guaranteed by RiseSun, with China Construction Bank (Asia) Corporation Limited serving as the notes trustee (the "New Notes Trustee"); and

(b)     Notes bearing interest at 9.5% with a tenor of 2.5 years (the "New 2024 Notes" and together with the New 2023 Notes, the "New Notes"), guaranteed by RiseSun, with the New Notes Trustee.

35.     On the Transaction Effective Date, all outstanding Existing Notes will be cancelled and all guarantees in connection with the Existing Notes will be released, including RiseSun's guarantee of the Debtor's obligations under the Existing Notes.

36.     Further, in exchange for the compromises set forth in the Scheme and the Scheme Consideration, the Scheme provides for certain releases, including the release by Scheme Creditors of any released claim against the Debtor, RiseSun, the Company and their affiliates and their personnel (the "Released Person").  The claims released through the Scheme include any

---

[5] A copy of the Explanatory Statement, as made available to Scheme Creditors on February 9, 2022 (following the Convening Hearing), is attached as Exhibit E to the Ridgers Declaration.

claim in connection with the Scheme Restructuring, an Ancillary Claim [6] or any past, present and/or future claim arising out of, relating to or in respect of: (a) the Existing Notes Documents; (b) the preparation, negotiation, sanction or implementation of the Scheme and/or the CSA; and/or (c) the execution of the various restructuring documents and the carrying out of the steps and transactions contemplated in the Scheme in accordance with their terms (for the avoidance of doubt, excluding any claims relating to the New Notes documents).

37.     If the Scheme is approved by the requisite majorities of creditors and sanctioned by the BVI Court and a sealed copy of the sanction order is filed with the BVI Registrar, the Scheme will bind all Scheme Creditors, including those creditors who voted in favor of the Scheme, those creditors who voted against it, and those creditors who did not vote at all.

## IV.     Commencement of the BVI Proceeding

38.     On January 17, 2022, the Debtor's sole director (the "Sole Director") approved a resolution, a copy of which is attached hereto as **Exhibit A** (the "Sole Director Resolution"), permitting the Debtor to propose the Scheme to initiate the restructuring of the Existing Notes, given the Company's recent financial difficulties, appointing myself as the Foreign Representative, and commencing the Chapter 15 Case. [7]  On the same day, the Debtor filed a Fixed Date Claim Form with the BVI Court, a true and correct copy of which is attached to the Ridgers Declaration as Exhibit B, commencing the Scheme in the BVI Court (the "BVI Proceeding"), and seeking, among other things, an order directing the Company to convene a meeting in respect of the Scheme

---

[6] Pursuant to the Scheme, an Ancillary Claim means a claim against a Released Person (other than the Debtor) arising directly or indirectly out of, in relation to and/or in connection with the Existing Notes Documents, whether before, at, or after the Record Time.

[7] Capitalized terms used in this section, but not defined, are given their meaning under the Ridgers Declaration.

(the "Scheme Meeting") for a single class of creditors only—namely, the Scheme Creditors—requesting a convening hearing (the "Convening Hearing") on February 8, 2022, and seeking the appointment of myself as the Foreign Representative.

39.     On January 18, 2022, the Debtor issued a practice statement letter to the Scheme Creditors, informing the Scheme Creditors that the Debtor wishes to commence the Scheme ahead of a Convening Hearing.   The Practice Statement Letter is attached to the Ridgers Declaration as Exhibit C.

40.     Following the Convening Hearing on February 8, 2022, the BVI Court entered the order listing the Scheme Meeting for March 3, 2022 at 7:00 a.m. (prevailing Atlantic Standard Time), listing the hearing to sanction the Scheme for March 10, 2022 (the "Sanction Hearing"), and appointing the Foreign Representative (the "Convening Order").   The Convening Order is attached hereto as **Exhibit B**.

41.     By February 9, 2022, and in accordance with the Convening Order, a notice of the Scheme Meeting substantially in the form set forth in Appendix 10 to the Explanatory Statement was sent to the Scheme Creditors by Morrow Sodali Limited, in its capacity as the Debtor's notification and information agent for the Scheme ("Morrow Sodali" or "MS").   Convening Order, ¶ 2–4.  The notice, the Scheme, the Solicitation Package, and the Explanatory Statement were also made available to the Scheme Creditors and other parties in interest on the following   website   maintained   by   MS   (the   "MS   Case   Website"): https://bonds.morrowsodali.com/RisesunScheme. *Id.*, ¶ 4–6.   In addition, the Debtor also published notice in various local newspapers to reach Scheme Creditors, including the *Business Times* in Singapore, the *London Gazette* in the United Kingdom, the *Neue Zurcher Zeitung* in Switzerland and the *BVI Beacon* in the BVI.   Further, in Hong Kong, the Debtor

published notice in English in the *South China Morning Post* and notice in Chinese in the *Singtao Daily*. Pursuant to the Convening Order, the Debtor is also required to make physical copies of the Scheme and Explanatory Statement available to all Scheme Creditors for collection free of charge prior to the Scheme Meeting. *Id.*, ¶ 7.

42.     In this instance, the BVI Court authorized and appointed Mr. Andrew Thorp of Harney Westwood & Riegels LP ("Harneys") and/or Mr. Alexander Teck Chai Ridgers of Harneys as the Scheme Chairperson. *Id.*, ¶ 9.

43.     The provisions of the Convening Order ensure that the Scheme Creditors will be notified properly of the Scheme Meeting and will have the opportunity to raise questions and objections to the Scheme at the Scheme Meeting and/or at the Sanction Hearing. As noted, pursuant to the terms of the Convening Order, in advance of the Scheme Meeting and Sanction Hearing, the Debtor, through its notification and information agent MS, will provide access to the Explanatory Statement and other documents related to the Scheme enumerated in the Convening Order to the beneficial holders of the Existing Notes on the MS Case Website and physical copies as well. *Id.*, ¶¶ 3–7. All Scheme Creditors will have the opportunity to attend, be heard and vote at the Scheme Meeting, in person, by authorized representative (if a corporate entity) or by proxy and to ask questions regarding the proposed Scheme.

44.     At the Scheme Meeting, a vote will be held to determine whether the Scheme Creditors that are present and voting in person or by proxy approve the Scheme by a greater than fifty percent (50%) majority in number representing at least seventy-five percent (75%) in value of the Scheme Creditors present and voting. If the Scheme Creditors do not approve the Scheme by the requisite majorities described in the foregoing sentence, the Scheme is not eligible to be sanctioned by the BVI Court and will not take effect.

45.    If the Scheme is approved at the Scheme Meeting, the Sanction Hearing is expected to be held on or about March 10, 2022, as set forth in the Convening Order. *Id.*, ¶ 17. The Scheme Creditors and any other creditors of the Debtor may choose to attend the Sanction Hearing and be heard and/or to raise objections.

46.    Assuming that the BVI Court deems it appropriate to enter an order sanctioning the Scheme following the Sanction Hearing (the "Sanction Order"), the Sanction Order is expected, among other things, to (i) sanction and approve consummation of the Scheme and (ii) authorize and effectuate the Scheme Restructuring set forth in the Scheme.  Upon delivery of the Sanction Order to the BVI Registrar of Companies and satisfaction of the other conditions precedent, the Scheme will become effective and thereby binding on all Scheme Creditors.

47.    As the BVI Proceeding is ongoing in parallel to this Chapter 15 Case and the Sanction Hearing is expected to be heard on or about March 10, 2022, I will file a supplemental declaration to update the Court on the status of the BVI Proceeding and the outcome of the Sanction Hearing, in advance of the Recognition Hearing, as defined in the Recognition Motion.

### STATUS AS FOREIGN REPRESENTATIVE AND OF FOREIGN PROCEEDINGS SATISFIES BANKRUPTCY CODE PROVISIONS

**I.    Appointment as Foreign Representative and Filing of the Chapter 15 Petition**

48.    I have been informed by the Debtor's legal advisers that a chapter 15 proceeding is commenced by the filing of a petition for recognition (and related documents) by the "foreign representative."  I was further informed that under section 1516(a) of the Bankruptcy Code, a bankruptcy court may presume that the person petitioning for chapter 15 recognition is a foreign representative if the decision or certificate from the foreign court so indicates.  I understand that "foreign representative" is defined in section 101(24) of the Bankruptcy Code to mean:

…a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

49.    I have been authorized by the Convening Order and the Sole Director Resolution to act as the Debtor's agent in seeking any relief available to a "foreign representative" under chapter 15 of the Bankruptcy Code, including, among other things, to seek recognition of the Scheme (the "Foreign Representative"). *See* Convening Order, ¶¶ 18–19.

50.    In light of the statutory presumption embodied in section 1516(a) of the Bankruptcy Code noted above, the Bankruptcy Code's definition of "foreign representative" and the Convening Order, I believe that I satisfy the requirements to serve as the Foreign Representative of the BVI Proceeding.

51.    The Debtor has property in the United States in the form of a retainer with the Debtor's U.S. counsel, Sidley Austin LLP, which funds are held in a client trust account in New York, New York.  Moreover, the Debtor has submitted to New York jurisdiction under the Existing Notes Documents and the New Notes indentures.  Therefore, on the date hereof, in my capacity as the Foreign Representative, I caused to be filed the Chapter 15 Petition pursuant to sections 1504 and 1515 of the Bankruptcy Code commencing this Chapter 15 Case in the Southern District of New York, seeking recognition of the BVI Proceeding as a "foreign main proceeding," as such term is defined in section 1502(4) of the Bankruptcy Code, or in the alternative as a "foreign nonmain proceeding," as such term is defined in section 1502(5) of the Bankruptcy Code, and seeking other necessary or appropriate relief in support of the BVI Proceeding.

52.    I believe that recognizing me as a "foreign representative" as defined in

17

section 101(24) of the Bankruptcy Code and recognition of the BVI Proceeding as a "foreign main proceeding" is consistent with the purpose of chapter 15 and will allow the Debtor to restructure in the most efficient manner without jeopardizing the creditors' rights.

## II.     The BVI Proceeding is a Foreign Main Proceeding

53.     For the reasons set forth below, I believe that the BVI Proceeding is a "foreign main proceeding" within the meaning of section 1502(4) of the Bankruptcy Code.

54.     I am informed that "foreign proceeding" is defined in section 101(23) of the Bankruptcy Code to mean:

> [C]ollective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the Debtors are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation ….

11 U.S.C. § 101(23).

55.     I believe that the BVI Proceeding falls within the foregoing definition.  As more fully explained in the Ridgers Declaration filed contemporaneously herewith, the BVI Proceeding is (i) a collective judicial proceeding, (ii) in the BVI, and (iii) is governed by the BVI statute applicable to schemes of arrangement, section 179A of the BVI Companies Act. *See generally* Ridgers Declaration, ¶¶ 20–21.  In the BVI Proceeding, the Debtor's assets and affairs are subject to the control or supervision of the BVI Court.  The purpose of the Scheme is reorganization by way of an adjustment of debt under the Existing Notes.

56.     I am also informed that section 1517(b)(1) of the Bankruptcy Code provides that a foreign proceeding shall be recognized as a "foreign main proceeding" if the foreign proceeding is pending in the country where the debtor has "the center of its main interests" ("COMI").  COMI is not defined in chapter 15, but I am informed that section 1516(c) of the Bankruptcy Code provides that "[i]n the absence of evidence to the contrary, the debtor's registered office, or

habitual residence in the case of an individual, is presumed to be the center of the debtor's main interests."

57.     I believe that, based on its place of incorporation and location of its registered office, the COMI of the Debtor is the BVI.   Additional factors supporting COMI in the BVI for the Debtor include:

(a)     **Location of Those Who Actually Manage the Debtor**. Although the Debtor's sole director, Mr. Zou Jiali does not reside in the BVI, he has played an active role in monitoring and coordinating the Debtor's affairs during the BVI Proceeding.  Pursuant to the Sole Director Resolution, Mr. Zou Jiali authorized retaining the Debtor's advisers and was involved in the negotiation of the various documents involved in the restructuring and the Scheme.  He has exercised certain powers conferred upon him by the BVI Court necessary for the implementation of the restructuring, including the oversight of the Debtor's development of the Scheme.

(b)     **Expectation and Support of Creditors**. The Existing Notes Documents identify the Debtor as a company incorporated in the BVI.  The Exchange Offer and Consent Solicitation package specifically disclosed the possibility of commencement of a BVI scheme by the Debtor.  In addition, holders of more than 75% of the Existing Notes expressly agreed to support a BVI restructuring pursuant to the Creditor Support Agreement.  Indeed, the Scheme Creditors overwhelmingly support the Debtor's BVI restructuring with over 75% of Existing Notes having delivered instructions to the Tender Agent to vote in favor of the Scheme.

(c)     **Location of books and records**: The Debtor maintains its books and records in the BVI.

## III.     Alternatively, the BVI Proceeding is a Foreign Nonmain Proceeding

58.     In the event that the Court concludes that the Debtor's COMI is not the BVI, I believe that this Court should recognize the BVI Proceeding as a "foreign nonmain proceeding." I am informed that a foreign nonmain proceeding takes place in a jurisdiction that is not the entity's center of main interests, but where it has an "establishment," as defined as "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. §§ 1502(2), (5).

19

59.     Prior to the date of the filing of the Chapter 15 Petition, the Scheme has centralized the Debtor's restructuring activities in the BVI.  In addition, I have played an active role in overseeing and managing the Debtor's affairs and evaluating the proposed restructuring, and have supported numerous filings and applications to the BVI Court.  Thus, it is evident that the Debtor at the very least has an "establishment" in the BVI.

## IV.   Statement Pursuant to Section 1515 of the Bankruptcy Code

60.     I am informed that section 1515 of the Bankruptcy Code provides, in pertinent part, as follows:

(a)     A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.

(b)     A petition for recognition shall be accompanied by—

1)      a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

2)      a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

3)      in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

(c)     A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

11 U.S.C. 1515.

61.     As noted above, the Sole Director Resolution authorizing commencement of this Chapter 15 Case is attached hereto as **Exhibit A**.  Further, the Convening Order constitutes a decision of the BVI Court commencing the BVI Proceeding and appointing myself as the Foreign Representative.  Convening Order, ¶¶ 18–19.

62.     Pursuant to section 1515(c) of the Bankruptcy Code, I am aware of the definition of a "foreign proceeding" under section 101(23) of the Bankruptcy Code, and I believe that the BVI Proceeding is a "foreign proceeding" as defined therein.  I am aware of no other foreign proceedings with respect to the Debtor.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: February 14, 2022

*/s/ Liu Jingrui*
Liu Jingrui
*Foreign Representative of RongXingDa
Development (BVI) Limited*