**<u>Exhibit A</u>**

**Sole Director Resolution**

**RONGXINGDA DEVELOPMENT (BVI) LIMITED (荣兴达发展(BVI)有限公司)**
*(incorporated in the British Virgin Islands with limited liability)*
**Company number 1999990**
**(the *Company*)**

Written Resolutions of the sole director of the Company pursuant to Article 29.4 of the Articles of Association of the Company (the *AOA*)

The undersigned, being the sole director of the Company (the *Sole Director*), hereby confirms and adopts the following director's resolutions.

**1    BACKGROUND**

**IT WAS NOTED THAT:**

1.1    The Sole Director refers to the draft practice statement letter (the *Practice Statement Letter*) as circulated.  As stated therein, it was noted that the Company intends to:

(a)    propose a scheme of arrangement (the *Scheme*) pursuant to section 179A of the Business Companies Act 2004 (*Companies Act*) of the British Virgin Islands (*BVI*) to certain creditors of the Company (the *Scheme Creditors*) comprising of the Noteholders (as defined below); and

(b)    apply to the High Court of the Eastern Caribbean Supreme Court of the BVI (the *Court*) to seek orders:

(i)    permitting it to convene a single meeting (the *Scheme Meeting*) of Scheme Creditors for the purposes of considering and, if thought fit, approving with or without modification, the Scheme; and

(ii)    if so approved, sanctioning the Scheme.

1.2    The proposed Scheme Meeting relates to a proposed single class of Scheme Creditors of the Company, which comprises of persons (the *Noteholders*), holding an economic or beneficial interest as principal as at the Record Time[1] for the Scheme, in:

(a)    An aggregate of US$500,000,000 8.0% senior notes (the *April 2022 Notes*) with a maturity date of 24 April 2022 issued pursuant to an indenture dated 24 April 2019 (the *April 2022 Indenture*) between the Company as issuer, RiseSun Real Estate Development Co., Ltd. (the *Parent*) (among others) as guarantor, and China Construction Bank (Asia) Corporation Limited as notes trustee (the *Note Trustee*); and

(b)    An aggregate of US$300,000,000 8.95% senior notes (the *January 2022 Notes*) with a maturity date of 18 January 2022 issued pursuant to an indenture dated 19 January 2021

---

[1] "Record Time" is the time designated by the Company for the determination of the outstanding principal amount of the Existing Notes held by the Scheme Creditors for the purposes of voting at the meeting of creditors convened to vote on the proposed scheme of arrangement

1

001

(the ***January 2022 Indenture***) entered into between the Company as issuer, the Parent as guarantor and the Note Trustee as the note trustee.

The April 2022 Notes and the January 2022 Notes are the ***Existing Notes***. The April 2022 Indenture and the January 2022 Indenture are the ***Indentures***. The maturity dates of 24 April 2022 and 18 January 2022 are the ***Maturity Dates***.

1.3  As at the date of these resolutions, the total amount outstanding under the April 2022 Notes is approximately US$487,700,000 and the total amount outstanding under the January 2022 Notes is approximately US$292,000,000.

1.4  The Maturity Dates are approaching and the Sole Director considers that the Company does not have sufficient funds to repay the Existing Notes when due.

1.5  The Sole Director notes that the objective of the Scheme Meeting is to enable Scheme Creditors to consider and if thought fit, approve the Scheme with or without modification.

**2     BACKGROUND TO THE RESTRUCTURING**

**IT WAS NOTED THAT:**

2.1  The Company is part of a group (the ***Group***) ultimately held by the Parent. The key business of the Group includes but is not limited to developing small to mid- sized residential properties, commercial properties and large scale urban complexes including offices, shopping centres, recreational facilities and ancillary facilities across various cities in the PRC.

2.2  As the Company is a special purpose vehicle without any operations, it was intended that payment under the Existing Notes would be paid by the Parent through operating income, net profit, cash flow from operating activities and other financing sources of the Group.

2.3  However, during the second half of 2021, property sales in the PRC significantly declined and PRC property developers struggled to obtain funding from onshore and offshore capital markets. As a result, the existing cash and internal resources of the Group will be insufficient to enable the Company to repay the Existing Notes on the Maturity Dates. The Sole Director is also informed by the Parent that the Parent is unable to make payment of the Existing Notes on the Maturity Dates as it, similarly, does not have sufficient liquidity to do so.

2.4  The Company (and the Parent) has appointed the following advisors (the ***Advisors***):

(a)  Haitong International Securities Company Limited and its affliates as the financial advisor (***Haitong***);

(b)  Sidley Austin LLP as the international legal counsel (***Sidley Austin***);

(c)  Harney Westwood & Riegels as the BVI legal counsel (***Harneys***); and

(d)  Morrow Sodali Limited as information, exchange and tabulation agent.

2.5  The Company (with the assistance of Haitong, Sidley Austin and Harneys (as to BVI law) and personnel from the Parent) explored various options to restructure the debts of the Company and

the Group to ensure the long-term viability of the Group and to generate the best possible return for its stakeholders, and conducted extensive negotiations and discussions with the Noteholders and their financial and legal advisers regarding the restructuring of the Company's liabilities. As a result of such negotiations:

(a) on 16 December 2021, the Company launched an exchange offer (the *Exchange Offer*) which offered certain eligible holders of the Existing Notes the opportunity to, among other things, exchange the Existing Notes for new notes with an extended maturity and terms designed to allow the Group to improve its financial condition and to continue as a going concern; and

(b) in order to increase the chances of a successful restructuring, at the same time as launching the Exchange Offer, the Company also entered into a creditor support agreement (the *CSA*). The CSA stated that if the Company deems there to be insufficient support to proceed with the Exchange Offer, the Company intends to restructure the Existing Notes via a scheme of arrangement under section 179A of the Companies Act in the terms as set out therein (the *Restructuring*) which are substantially similar to those in the Exchange Offer.

2.6 By the expiration deadline of the Exchange Offer, over 75% of all Existing Notes were tendered for the Exchange Offer. However, the Company did not obtain sufficient support from the Eligible Holders of the Existing Notes to effect the Exchange Offer. The Company therefore wishes to proceed with the Restructuring.

2.7 As at the date of these resolutions, Noteholders holding over 75% of the total outstanding principal amount of the Existing Notes have acceded to the CSA. A Noteholder who accedes to the CSA also undertakes to support the Restructuring and to vote in favour of the Scheme.

**3      THE KEY TERMS OF THE PROPOSED SCHEME**

**IT WAS NOTED AS FOLLOWS:**

3.1 The Advisors have been instructed to and are drafting the documents necessary to give effect to the Restructuring. Whilst the drafts are in progress, they are not in final form.

3.2 The Sole Director notes that, pursuant to the terms of the CSA and the Exchange Offer, the key terms of the proposed Scheme are that the Scheme Creditors will irrevocably, unconditionally, fully and absolutely release (among others) the Company and the Parent from their respective obligations and liabilities under or in connection with the Existing Notes and the Indentures for receiving the following consideration (the *Scheme Consideration*):

(a) A cash redemption of 5% of the outstanding principal amount of the Existing Notes held by each Scheme Creditor as of the Record Time;

(b) New notes in an aggregate principal amount of 95% of the outstanding principal amount of the Existing Notes held by each Scheme Creditor as of the Record Time; and

(c) Accrued and unpaid interest up to but excluding the Transaction Effective Date, in cash.

3.3 In addition, each Noteholder who acceded to the CSA before 4:00 p.m. London Time on 7 January 2022 (the *Instruction Fee Deadline*) and voted in favour of the Scheme in accordance with the terms of the CSA will, subject to the terms of the CSA, receive an instruction fee (the *Instruction Fee*), being an amount of cash equal to 1.5% of the aggregate principal amount of each eligible Existing Note held by each such Noteholder.

3.4 After considering the position of the Company based on the information available to him, the Sole Director believes that the Restructuring and the participation by the Company in the transactions contemplated by the Scheme is in the best interests of the Company and its stakeholders and is approved by the Sole Director.

3.5 The Sole Director considers that if he is, for any reason, unable to implement the Restructuring (including the Scheme), he will be required to take steps to appoint liquidators to the Company. Accordingly, the relevant comparator to the Scheme is the insolvent winding-up of the Company, which would be to the detriment of the Company and all of its stakeholders, including the Scheme Creditors. The Company and the Parent have instructed Kroll Advisory to prepare a liquidation analysis. Whilst this is not yet complete, on the basis of current information, the Sole Director believes that the Company would not (on the Maturity Dates) be able to repay its creditors (including the Scheme Creditors) in full, (such that the Company is imminently unable to pay its debts as they fall due), the quantum and timing of any distributions to its creditors would be very uncertain in a liquidation and the recoveries for creditors would be far lower than the anticipated recovery to Scheme Creditors under the Scheme.

**4    DRAFT DOCUMENTS CIRCULATED**

**IT WAS NOTED AS FOLLOWS:**

4.1 Forms of the following documents have been prepared by the Company in consultation with its Advisors and the Sole Director refers to the latest drafts of the following documents (the *Draft Initial Scheme Documents*):

   (a)    The Practice Statement Letter;

   (b)    The Fixed Date Claim Form; and

   (c)    The witness statement in support of the Fixed Date Claim Form (the *Draft Initial Court Documents*).

4.2 The Company has been working closely in conjunction with Mr. Liu Jingrui (*Mr. Liu*), the General Manager of Capital Markets and the General Manager of the Hong Kong office of the Parent, to achieve the terms of the Restructuring. The proposed Restructuring is a key part of a holistic restructuring of the Group led by the Parent. Mr. Liu (as an employee of the Parent) has been appointed to negotiate with all the creditors in the Group, including the creditors of the Company. Mr. Liu has the intrinsic knowledge of the finances of the Company, the Group and the Restructuring, and the Sole Director considers that Mr. Liu is an appropriate person to make the witness statement as an authorised representative of the Company, together with all ancillary and connected documents and to give instructions in relation to the same.

4.3  The Draft Initial Scheme Documents were prepared based on preliminary drafts of the scheme documentation. It is noted that the Initial Scheme Documents are yet to be finalised and the final versions may vary from the drafts that have been circulated to the Sole Director. Once the scheme documentation is in near final form, it is intended that a further witness statement will be filed with the Court.

**5  CONSTITUTION OF CLASSES**

**IT WAS NOTED AS FOLLOWS:**

5.1  The Company has been advised that classes of creditors are required to be formulated for the purpose of convening meetings to consider and, if thought fit, approve the proposed Scheme with or without modification.

5.2  The Company has been advised its legal advisors that the Scheme Creditors fall into a single class of creditors on the basis that the rights of the Scheme Creditors: (i) against the Company which are to be released or varied under and pursuant to the Scheme; (ii) to receive the Scheme Consideration under the Scheme; and (iii) in an insolvent liquidation of the Company, being the likely alternative scenario if the Scheme is not implemented, in each case are not so dissimilar as to make it impossible for them to consult together with a view to their common interest.

5.3  As set out above, given the financial position of the Company, the Sole Director considers that the most appropriate comparator for assessing the rights of Scheme Creditors are not so dissimilar as to make it impossible for them to consult together with a view to their common interest is an insolvent liquidation. In an insolvent liquidation of the Company, the Scheme Creditors would all have a right to receive a *pari passu* dividend based on the value of their claims, save that it is noted that the value of the pool from which the dividend would be paid will be significantly lower than under the Scheme.

5.4  The Company has been advised by its legal advisors that that the existence of the Instruction Fee would not impact on the constitution of classes of Scheme Creditors for the purposes of the Scheme because:

(a)  The existence and terms of the CSA have been made publicly available to all Scheme Creditors;

(b)  The Instruction Fee has been offered to all Scheme Creditors on an equal basis, provided that they became a party to the CSA by the relevant deadlines and voted in favour of the Scheme and the Scheme Meeting; and

(c)  It is unlikely that a Scheme Creditor who is not eligible to receive the Instruction Fee would be persuaded to vote against the Scheme because:

(i)  The Instruction Fee is *de minimis* and only represent approximately 1.5% of the aggregate outstanding principal amount of the Existing Notes; and

(ii)  The alternative of an insolvent liquidation would result in the Scheme Creditors receiving returns that are significantly lower than under the Scheme.

**6        FOREIGN REPRESENTATIVE**

**IT WAS NOTED AS FOLLOWS:**

6.1    The Sole Director understood from the Advisors that, because the Existing Notes are governed by New York law, it may be possible for a Noteholder to commence proceedings in New York against the Company even after the Scheme is sanctioned by the Court. The Company is further advised that, in order to avoid this risk, the Company can seek recognition of the orders made by the Court in relation to the Restructuring from the United States Bankruptcy Court under Chapter 15 of the US Bankruptcy Code (Title 11 of the United States Code) (**Chapter 15**). Accordingly, the Company shall appoint a foreign representative (**Foreign Representative**) to make any appropriate application under Chapter 15.

**7        NO RESTRICTION**

7.1    The Sole Director, by his signature below confirms that no resolution of the members has been passed which restricts the powers of the director/s to resolve on matters relating to the matters referred to in the resolutions.

**8        DISCLOSURE OF INTEREST**

8.1    Pursuant to article 31.4 of the AOA, a director shall be at liberty to vote in respect of any contract or transaction in which he is interested providing that the nature of the interest of the director in any such transaction is disclosed by him at or prior to its consideration and vote thereon.

8.2    The Sole Director is interested in the Restructuring and Scheme as he receives remuneration for performing his role in the Company.

**9        RESOLUTIONS**

The undersigned, being the Sole Director, **HEREBY ADOPTS AND CONFIRMS THE MAKING OF THE FOLLOWING RESOLUTIONS:**

9.1    **THAT**, the implementation of and giving effect to the Restructuring, including the implementation and entering into the Scheme and issuing the PSL are in the best interests of the Company and be and are hereby approved;

9.2    **THAT**, after considering the advice from the Advisors, the Sole Director believes that the Scheme Creditors fall within a single class in that the rights of the Scheme Creditors are not so dissimilar as to make it impossible for them to consult together with a view to their common interest.

9.3    **THAT** the content of the Draft Initial Scheme Documents is approved.

9.4    **THAT** the Sole Director and/or Mr. Liu, the General Manager of Capital Markets and the General Manager of the Hong Kong office of the Parent, be appointed and authorised to give statements in respect the Company's business and Restructuring, including but not limited to the Fixed Date Claim Form and any witness statement(s) in support of the Fixed Date Claim Form.

9.5 **THAT**, Sole Director and/or Mr. Liu, the General Manager of Capital Markets and the General Manager of the Hong Kong office of the Parent be and are hereby authorised to negotiate, approve, agree and finalise any amendments to the Practice Statement Letter and the issuance and service of same to the Scheme Creditors on behalf of the Company as required for the Scheme with or without modifications, additions or conditions.

9.6 **THAT**, the Sole Director and/or Mr. Liu, the General Manager of Capital Markets and the General Manager of the Hong Kong office of the Parent be and are hereby authorised to negotiate, approve, agree and finalise any amendments to the Draft Initial Court Documents as they think fit, make and authorise the filing of same with the Court, and the BVI Registrar of Corporate Affairs in the name and on behalf of the Company, as required for the Scheme pursuant to section 179A of the Companies Act with or without modifications, addition or conditions and including in relation to any adjournment thereof.

9.7 **THAT**, the Sole Director and/or Mr. Liu, the General Manager of Capital Markets and the General Manager of the Hong Kong office of the Parent be and is hereby authorised to, for and on behalf of the Company, issue all relevant notices and announcements (including but not limited to announcements in the SGX) in respect of the Restructuring, and **THAT** all such announcements previously published by the Company in connection with the Restructuring generally be and are hereby approved, confirmed and ratified.

9.8 **THAT**, the Company appoints, Mr. Liu, the General Manager of Capital Markets and the General Manager of the Hong Kong office of the Parent as the Company's Foreign Representative for a one-year period as at the date hereof. The Foreign Representative:

(a) will have specific powers to individually bind and represent the Company with respect to the Scheme, including for the purposes of seeking any relief available to a "foreign representative" in any application commenced under Chapter 15 (the ***Chapter 15 Proceeding***);

(b) be and is hereby authorised to act as the Company's agent in seeking any relief available to a "foreign representative" in the Chapter 15 Proceeding;

(c) be and is hereby authorised and empowered to retain and employ on his own behalf in his capacity in the relevant proceedings at the expense of the Company, the law firm of Sidley Austin or another US legal counsel as appropriate, in connection with pursuing the Chapter 15 Proceeding; and

(d) be and is hereby authorized to execute and file any and all petitions, schedules, motions, lists, applications, pleadings, declarations, and other papers, and to take any and all further actions which the Foreign Representative or the Company's legal counsel may deem necessary, proper, or desirable in connection with the Chapter 15 Proceeding, with a view to the successful resolution of such case.

9.9 **THAT** the Sole Director hereby appoints and authorises:

(a) Sidley Austin to act as US counsel of the Company in connection with any Chapter 15 Proceeding;

7

(b) Harneys to act as (i) BVI counsel; and (ii) the agent of the Company to file all and any documents as necessary on the Company's behalf before the Court in respect of the Scheme including in relation to any adjournment thereof; and

(c) Morrow Sodali Limited to act as information, exchange and tabulation agent and be authorised to take all actions necessary to execute their duties in accordance with the Scheme.

9.10 **THAT** the terms of the CSA and the Instruction Fee pursuant to the CSA be and are hereby approved, confirmed and ratified.

9.11 **THAT** any and all actions of the Company, the Sole Director or of Mr. Liu, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution of these resolutions be and are hereby are ratified, confirmed, approved and adopted in all respects by the Company.

**\*\*signature page to follow\*\***

Dated the 17th day of January 2022

_____
**MR. ZOU JIALI**
*Sole Director*

9

009